511 So.2d 1368 (1987)
James Lee TOLBERT
v.
STATE of Mississippi.
No. 56850.
Supreme Court of Mississippi.
August 12, 1987.
Rehearing Denied September 16, 1987.
*1369 Orma R. Smith, Jr., Smith, Ross & Trapp, Corinth, for appellant.
Edwin Lloyd Pittman, Atty. Gen. by DeWitt Allred, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before HAWKINS, P.J., and ROBERTSON and ANDERSON, JJ.
ROBERTSON, Justice, for the Court:

I.
Today's is a case of murder. The appeal does not claim innocence but denial of a fair trial. If perfection be the standard, the charge must prevail, for several things happened below that could and perhaps should have been avoided. All in all, the Defendant received a fair trial, albeit not one perfect. In the end, Defendant has presented nothing that undermines our confidence in the integrity of the jury's verdict.
We affirm.

II.
Love's recurring triangle, the source of such emotions and passions through the centuries, never claims but one victim. Annie Katherine Boyd Cox (Kat) is dead. James Lee Tolbert has been convicted of murder. Others have been scarred.
The contours of today's triangle were the source of great controversy at not one but *1370 two trials.[1] Was it Tolbert's jealousy of his fiancee's rekindling her romance with her former husband, Ernest Cox (Cox); or was it the unnatural desires for Kat arising out of a lesbian relationship with Annie Dilworth which caused the gun to fire the one single bullet which took the life of Kat, an attractive thirty-two-year-old female?
Some parts of the story are clear. In 1978, Kat and Cox were divorced. Subsequently, Kat met Tolbert, and they began dating. Their relationship progressed and they became engaged to be married. By this time, Kat and Tolbert were living together in Tolbert's apartment in Tupelo and Kat's home in Corinth. Apparently, however, Kat maintained contact with Cox while dating Tolbert.
For Kat, Sunday, March 22, 1981, began in deception and ended in death. She spent the day and the better part of the evening with her former husband, Cox. Knowing Tolbert would be suspicious, Kat and Annie Dilworth and Carolyn Pollard Brand fabricated a story that they had been playing cards in Jackson, Tennessee, all day. That evening, when she arrived at her home, Kat was shot and killed. Eyewitnesses claimed that Tolbert had a gun, started beating Kat and eventually shot her after she arrived at her home. Tolbert claims that the shooting was an accident, resulting from a scuffle that ensued with Kat and her girlfriends.
Witnesses for the prosecution indicated that Tolbert was the aggressor and that he alone shot Kat. Ernest Cox, Kat's former husband, testified that he and Kat spent most of that particular Sunday together, with Kat leaving his home later that evening between 10:30 and 11:00 p.m. Kat left Cox's home with her friend, Annie Dilworth (hereafter "Dilworth"), and Dilworth's friend, Carolyn Brand (hereafter "Brand"). Kat persuaded Dilworth and Brand to fabricate the story about playing cards in Jackson, Tennessee, so that if they encountered Tolbert, Kat would have a legitimate excuse for being away from home the entire day.
After changing clothes at a friend's home, Kat, Dilworth and Brand drove to Kat's home. Upon their arrival, Tolbert came out of Kat's home, and according to Dilworth and Brand, he had a gun in his hand. Dilworth and Brand testified that Tolbert started beating Kat, and kept clicking the gun at her. Dilworth and Brand both testified that Tolbert then shot Kat.
The prosecution called other eyewitnesses to corroborate Dilworth and Brand's story. Charles R. Barnett, Jr. a/k/a "Junebug", Kat's nephew, testified that on the night of March 22, 1981, his sister, Bernita Barnett, woke him to watch the commotion in Kat's driveway. Junebug testified that he saw Tolbert and Kat fighting, with Kat trying to defend herself. He testified that Tolbert was hitting Kat, and had a gun in his hand. Junebug then saw Tolbert shoot Kat.
Junebug's sister, Bernita, who was Kat's niece, testified that around 10:15 that evening, Tolbert came to their home and asked Bernita where Kat was. Bernita believed that Tolbert had been drinking. She testified that Tolbert seemed very upset because Kat was not at home and that he was going to wait on her and beat her when she came home. Bernita then saw Kat drive up with Dilworth and Brand, and Tolbert ran out the door asking Kat where she had been. She testified that Tolbert immediately began hitting Kat, and that Kat was trying to defend herself. Bernita testified that they kept fighting, and that as they moved around to the driver's side of the car in which Kat drove up, a gun went off and Kat fell to the ground. Bernita saw a gun in Tolbert's hand.
Roger Voyles, who at the time of this trial was a deputy sheriff in Alcorn County, lived with his grandmother next door to Kat. Voyles testified that, on the night of March 22, 1981, he heard a car drive up at Kat's, and a woman scream. Voyles then *1371 walked onto his front porch, and he saw Tolbert hitting and cussing Kat. Voyles then saw Tolbert reach into his coat, take out a pistol and start to hit Kat. Voyles testified that Tolbert then shot Kat.
Delois Boyd Pratt, Kat's sister, testified that Tolbert called and visited her the night of March 22, 1981, mad and cussing and asking about Kat. Raynelle Barnett, Kat's sister and Junebug and Bernita's mother, testified that Tolbert called her that night, looking for Kat and sounding upset. Also, Raynelle testified that Tolbert came up to her fence late that night and told her that he had shot Kat.
The prosecution also called law enforcement officials that were involved with the incident that evening. Officers Whitehead and Brinkley, with the Corinth Police Department, testified that, when they arrived on the scene, they were asking people what happened, and someone shouted "He did it". Brinkley turned to Tolbert and asked Tolbert if he knew anything about what happened, and Tolbert said "I shot her." Officer Brinkley then placed Tolbert under arrest.
Tolbert called no eyewitnesses but testified on his own behalf. Somewhere between 5:00 and 6:30 p.m. on March 22, 1981, Tolbert went to Kat's home. He stayed in Kat's home for awhile, then he went to Kat's father's home looking for her. Afterwards, he talked with Kat's brother and they went looking for her. During their search, they stopped at Sonny Barnett's home across the street.
After searching to no avail, Tolbert returned to Kat's home where he was going to leave money that she had requested and pick up a pistol that he had left there. Tolbert placed the money Kat had requested on the kitchen counter and got his pistol out of a bedroom drawer. He started out of the house to tell Sonny Barnett that he was going to leave and go back to Tupelo. As he came out of the house, he placed the gun on top of an old car parked outside. When Tolbert went over to the Barnett home, Bernita answered the door. Tolbert testified that he simply told Bernita that he had left Kat's money, and he was about to go back to Tupelo.
Tolbert testified, contrary to Bernita's testimony, that he never went into the house to talk with her, and that he had not been drinking. Tolbert then testified that he went back to Kat's home, and ran into the home to answer the ringing telephone. Tolbert then called Ernest Cox, and asked about Kat. As he was talking to Cox, a car drove up into the driveway. Kat, Dilworth and Brand were in the car.
Tolbert testified that he came out of the front door and called for Kat, but no one answered. Instead, Dilworth shouted, telling him that they were going to teach him to stay away from Kat. Tolbert said the women started advancing toward him. Tolbert tried to get the pistol that he had placed on the car. He grabbed the gun, and the other three women started struggling with him over the gun. During the scuffle, the gun went off. Immediately after the gun went off, Dilworth left the scene. However, she came back later and he unlocked the kitchen door for her.
Tolbert testified that he took the pistol off the ground and took it into the bedroom and opened the chamber, shaking the bullets out of it. He then grabbed some towels and went outside, giving them to Brand. He then tried to call an ambulance, but could not get a dial tone on the phone that he had been using. Subsequently the police arrived and arrested Tolbert.
Tolbert also called John Kilty, who was a special agent with the FBI. Under Kilty's direction and supervision, neutron activation analyses were conducted on materials obtained from the hands of Kat and Tolbert. Based on these analyses, Kilty was unable to determine whether Kat or Tolbert fired the gun.
Tolbert also called Karen Thorpe, the director of medical records at Magnolia Hospital, in order to introduce medical records indicating that Tolbert was upset when he visited the emergency room. Tolbert also called Laura Pritchett, an employee of Magnolia Hospital at the time of the incident, to describe his condition that night. Additionally, Tolbert called Dr. *1372 Charles B. Ferguson, the doctor who treated him in the emergency room on the night of the incident.
The jury returned a verdict against Tolbert for murder. On December 1, 1984, the Circuit Court sentenced Tolbert to life imprisonment. He then filed a motion for a new trial, which was denied on May 9, 1985. Accordingly, Tolbert brings this appeal.

III.
Tolbert first argues that the prosecution intentionally destroyed a piece of exculpatory evidence and, as a consequence, that the charges against him should have been dismissed. Tolbert refers to a piece of skin, cut from his right forefinger shortly after the fatal shooting. This piece of skin, he argues, would, upon proper analysis, have proved that he could not have fired the fatal shot.
Following his arrest, Tolbert was taken to the emergency room of the Magnolia Hospital in Corinth. There, at the request of Sheriff Edwin Coleman, Dr. Charles Ferguson clipped a small particle of skin from an abrasion on Tolbert's right index finger. This particle of skin, however, was not sent to the Mississippi Crime Laboratory and has apparently been lost. Tolbert moved the Circuit Court to dismiss the indictment on the grounds that this particle of skin was material, exculpatory evidence that had been intentionally destroyed or lost by the State. The Court denied this motion, both at the close of the State's evidence and at the close of all of the evidence. The point was renewed in Tolbert's motion for new trial, and was again denied.
Tolbert's thesis is this: that it would have been impossible for him to have pulled the trigger on the gun and shoot off part of his right index finger at the same time. Tolbert argues that proper analysis of this skin particle would have proved that his hand was on the barrel of the gun, and not near the trigger when the gun went off, thus exonerating him.
The watershed case is California v. Trombetta, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). Trombetta held that due process does not require law enforcement officers to preserve breath samples in order to introduce breath analysis tests at trial. 467 U.S. at 491, 104 S.Ct. at 2535, 81 L.Ed.2d at 423. En route Trombetta held that the State's duty to preserve evidence is "limited to evidence that might be expected to play a significant role in the suspect's defense." 467 U.S. at 488, 104 S.Ct. at 2534, 81 L.Ed.2d at 422.
To play a significant role in the defendant's case, the exculpatory nature and value of the evidence must have been (1) apparent before the evidence was destroyed and (2) of such a nature that the defendant could not obtain comparable evidence by other reasonable means. 467 U.S. at 489, 104 S.Ct. at 2534, 81 L.Ed.2d at 422; United States v. Binker, 795 F.2d 1218, 1230 (5th Cir.1986). And, "the mere possibility the evidence might aid the defense does not satisfy the constitutional materiality standard." Binker, 795 F.2d at 1230; United States v. Webster, 750 F.2d 307, 333 (5th Cir.1984). In deciding whether the destruction of evidence constituted a due process denial, the Trombetta Court also considered whether the government agents had acted in good faith and in accord with their normal practice or had made a conscious effort to suppress exculpatory evidence. 467 U.S. at 488, 104 S.Ct. at 2533, 81 L.Ed.2d at 422. In other words, the prosecution's destruction of evidence must not have been in bad faith. See Webster, 750 F.2d at 333; United States v. Herndon, 536 F.2d 1027, 1029 (5th Cir.1976).
Washington v. State, 478 So.2d 1028, 1032-33 (Miss. 1985) is this Court's most deliberate pronouncement on the subject.
It is a general rule that the intentional spoliation or destruction of evidence relevant to a case raises a presumption, or, more properly, an inference, that this evidence would have been unfavorable to the case of the spoliator. Such a presumption or inference arises, however, only where the spoliation or destruction was intentional and indicates fraud and a desire to suppress the truth, and it does not arise where the destruction was a *1373 matter of routine with no fraudulent intent. (citation omitted)
478 So.2d at 1032-33. See also Coyne v. State, 484 So.2d 1018 (Miss. 1986).
Washington accords with Trombetta although inexplicably Washington does not cite Trombetta. In analyzing whether the absence of the skin particle denied Tolbert's constitutional right to a fair trial, the Court must determine if the skin particle would have played a significant role in Tolbert's case. To play a significant role in Tolbert's case, the exculpatory nature and value of the skin particle must have been apparent before it was lost, and been of such a nature that Tolbert could not obtain comparable evidence by other reasonable means.
Regarding the prosecution's good faith vel non, Sheriff Coleman explained at trial why he did not send the skin particle to the crime lab for analysis:
Well, the original purpose that we had it clipped was that I was going to send it off to the lab to determine if there was any lead in the finger. You know, he said it was a gunshot wound and after observing and looking at the finger, after we did the neutron test[[2]] on the finger, before we took him to the hospital, we did the test. We had the skin clipped at the hospital and was going to send that off to the lab and determine if, in fact, he had been shot but after we clipped the finger and talked about what happened, we just didn't send the skin off, we didn't send it off because we didn't think it would be important because we had done the neutron test which would give the same result so we just didn't send it off.
There is nothing in this testimony suggesting prosecutorial bad faith. Moreover, the record  as distinguished from Tolbert's brief  contains precious little suggesting that the skin particle may have played any significant role at trial. The lay witness testimony indicated the cut appeared to be only a minor abrasion. The expert testimony indicated that Tolbert's finger would have severe powder burns or had been blown off if it was on the barrel of the gun. Faithful application of Trombetta and Washington mandate that the assignment of error be denied.

IV.
Tolbert next argues that the Circuit Court erred in refusing proffered testimony that Kat, the victim, had a reputation for violence and for carrying a weapon.
During the State's case-in-chief, Ernest Cox, Kat's former husband, was called to testify. The following colloquy occurred:
Q. Not quite two years, okay, what was the relationship between the two of you. Well, during the time you were married, what was the relationship between the two of you,  was it good or was it one where there was often violence?
A. It was good.
Q. Okay, during that period of time you got to know Katherine well enough to know that she had a very high temper, didn't she?
A. Yes, I sure did.
Q. And you knew that she habitually carried a weapon in her purse, didn't she?
A. Not all the time.
Q. But on some occasions she did?
A. Everybody does.
Q. I am sorry?
A. Everybody does.
Q. Everybody does?
A. Almost.
Q. Almost, she knew how to use that weapon too, didn't she?
A. Not really.
Q. And when her temper got away from her, she would use it, wouldn't she?
BY MR. GEDDIE:
Objection, Your Honor.
BY JUDGE GARDNER:
Sustained.
BY MR. SMITH:
May we ask that the jury be excused?
BY JUDGE GARDNER:

*1374 All right.
(The jury leaves the court room and goes to the jury room).
While the jury was out, defense counsel questioned Cox about Kat's propensity for violence during their marriage. The Circuit Court ruled that this evidence was irrelevant because at that point in the trial there was no evidence that Kat had been the aggressor. Immediately after the jury came back in, defense counsel asked the following question:
Q. Mr. Cox, did you know of your former wife's reputation in the community for violence?
The State objected, and the Court sustained the objection.
Under Mississippi law at the time of this trial,[3] character or reputation of the deceased was not admissible in a murder case unless there was doubt as to who was the aggressor. Berry v. State, 455 So.2d 774, 776 (Miss. 1984); Fornett v. State, 392 So.2d 1154, 1156 (Miss. 1981); McDougle v. State, 355 So.2d 1386, 1389 (Miss. 1978). In the instant case, all of the testimony heard prior to the proffer of Cox's testimony indicated that Tolbert was the aggressor. Conversely, there was no evidence that Kat was the aggressor. Indeed, Tolbert's theory of defense was that the fatal shot was fired by accident.
Had the predicate been laid, i.e. that Kat was the aggressor, or at least there had been doubt at this point as to who was the aggressor, evidence of Kat's character may have been admissible. However, here Tolbert offered no such predicate. The assignment of error is denied.

V.

A.
Tolbert next challenges admissibility of two incriminating statements he made, one at the scene of the incident and the other while being transported to jail in the patrol car.
Officer Billy Ray Whitehead testified that he and Officer Andrew Adams were the first officers to arrive at the scene. When they arrived, there were a number of people standing around in the yard, and a lady weeping over a body lying beneath the carport. Whitehead approached the lady. Before he could ask what happened, the lady pointed to Tolbert and said "He shot her." Whitehead testified that he then turned to Tolbert and asked him "Can you tell me anything about it?" Tolbert then stated, "I shot her." Whitehead testified that Tolbert then reached in his coat, and Whitehead and Officer Brinkley drew weapons on Tolbert as a defensive measure.
Regarding this statement, the Circuit Court ruled:
The court is of the opinion that these were statements made by the defendant to officers who were investigating the circumstances at the scene. The defendant in this case was not in custody, the Miranda protection is directed towards statements that are the subject of custodial interrogation and I think there are sufficient cases that demonstrate the circumstances in this case are not of the nature that would invoke the Miranda provisions; therefore as to the statements made at the scene, shortly after the arrival of the police, the motion will be denied, that is, they will be admissible at trial.
Absent a knowing and intelligent waiver of rights, statements made by a suspect while under "custodial interrogation" are inadmissible at trial where prior to making the statements the suspect was not Miranda warned. Miranda v. Arizona, 384 U.S. 436, 444-45, 478-79, 86 S.Ct. 1602, 1612, 1630, 16 L.Ed.2d 694, 706-07, 726 (1966); Jones v. State, 461 So.2d 686, 696-701 (Miss. 1984); see Rule 1.03, Miss. Unif.Crim.R.Cir.Ct.Prac. However, firmly embedded in the jurisprudence of this state *1375 and many others[4] are at least types of circumstances wherein Miranda never comes into play; circumstances, that is, which are by definition excluded from Miranda's scope.
First, Miranda is never brought to bear where the interrogation is investigatory and non-custodial. Where the interrogation is part of the "general on-the-scene investigation," Miranda warnings are not a prerequisite to the admissibility of the defendant's statements. Pennington v. State, 437 So.2d 37, 41 (Miss. 1983); Fornett v. State, 392 So.2d 1154, 1155-56 (Miss. 1981); Yazzie v. State, 366 So.2d 240, 243 (Miss. 1979); Norman v. State, 302 So.2d 254, 258-59 (Miss. 1974); Ford v. State, 226 So.2d 378, 381 (Miss. 1969); Nevels v. State, 216 So.2d 529, 530 (Miss. 1968); see also Miranda, 384 U.S. at 477, 86 S.Ct. at 1629, 16 L.Ed.2d at 725. The constitutionally mandated warnings followed by the defendant's waiver are prerequisites to a confession's admissibility only where the "accusatory stage"[5] has been reached or the interrogation is "custodial".
Second, any noncustodial statement given freely and voluntarily without coercion requires no Miranda warning for admissibility. Fornett, 392 So.2d at 1155-56; Neal v. State, 386 So.2d 718, 720 (Miss. 1980); Cork v. State, 292 So.2d 164, 166 (Miss. 1974); Burge v. State, 282 So.2d 223, 226 (Miss. 1973); Chinn v. State, 276 So.2d 456, 460 (Miss. 1973); Fabian v. State, 267 So.2d 294, 296 (Miss. 1972); Pitts v. State, 257 So.2d 521, 522-23 (Miss. 1972); Moore v. State, 237 So.2d 844, 848 (Miss. 1970); Robinson v. State, 228 So.2d 373, 376 (Miss. 1969); Boyles v. State, 223 So.2d 651, 654 (Miss. 1969); Spurlin v. State, 218 So.2d 876, 878 (Miss. 1969); Nevels, 216 So.2d at 530; see also Miranda, 384 U.S. at 478, 86 S.Ct. at 1630, 16 L.Ed.2d at 726.
Tolbert's "I shot her" statement fell under the first of the Miranda exclusions. The statement was made at the scene and was a part of Officer Whitehead's general on-the-scene investigation. The stage at which law enforcement authorities had formally focused the accusation process upon Tolbert had not then been reached. The statement was admissible, as the Circuit Court correctly held.

B.
The second statement challenged is that Tolbert made to police officers while being transported in the patrol car to jail. He refers here to his statement made after getting in the patrol car, telling the officers where the gun was and that he "didn't mean to do it, that it was only an accident."
Officer Brinkley testified at the suppression hearing that, after Tolbert made the initial statement indicating that he had shot Kat, Brinkley and Officer Whitehead searched him, handcuffed him and carried him to the patrol car. Brinkley then gave Tolbert the Miranda warning and asked Tolbert if he understood it, and Tolbert replied that he did. Brinkley testified that he and Officer Whitehead then questioned Tolbert and Tolbert told them where the gun was, and that the shooting had been an accident. Officer Whitehead substantiated Brinkley's testimony.
At the hearing on the motion to suppress, the prosecution called Officers Adams and Brinkley, who testified as to the statements given by Tolbert. The defense moved to suppress, arguing that the prosecution had failed to bring in all of the witnesses who were present at the time the statements were made. The Circuit Court ruled that, once the prosecution has made its prima facie case of voluntariness, it is not required to put on all the officers who were present, unless the defense at least *1376 creates an issue of involuntariness. Tolbert did not testify at the hearing, nor did he otherwise generate a voluntariness issue.
In Agee v. State, 185 So.2d 671 (Miss. 1966), this Court stated:
The State has the burden of proving the voluntariness of a confession. This burden is met by the testimony of an officer, or other person having knowledge of the facts, that the confession was voluntarily made without any threats, coercion or offer of reward. This makes out a prima facie case for the State on the question of voluntariness. Lee v. State, 236 Miss. 716, 112 So.2d 254 (1959). When objection is made to the introduction of the confession, the accused is entitled to an preliminary hearing on the question of the admissibility of the confession. This hearing is conducted in the absence of the jury. Lee v. State, supra, is also authority for the proposition that when, after the State has made out a prima facie case as to the voluntariness of the confession, the accused offers testimony that violence, threats of violence, or offers of reward induced the confession, then the State must offer all the officers who were present when the accused was questioned and when the confession was signed, or give an adequate reason for the absence of any such witness. See also Holmes v. State, 211 Miss. 436, 51 So.2d 755 (1951).
185 So.2d at 673.
In today's case, the prosecution made out a prima facie case of voluntariness of the confession via the testimony of Officers Adams and Brinkley. Tolbert offered no witnesses to rebut the prima facie case. Indeed, the only witness called by Tolbert was Officer Whitehead, the officer who was in the patrol car with Officer Brinkley. Whitehead supported Brinkley's version regarding Tolbert's statement made in the patrol car after Miranda warnings. This showing was insufficient to require the prosecution to produce all of the witnesses to the statement. See Hemmingway v. State, 483 So.2d 1335, 1337 (Miss. 1986). Moreover, as a practical matter, all of the law officers who heard Tolbert's statement in the patrol car ended up testifying anyway.
Other than the Agee challenge, the only other grounds for rendering the statement made to the officers in the patrol car inadmissible would be if the officers failed to give Tolbert the Miranda warning before he made the statements. In the instant case, the testimony of the officers indicates that Miranda warnings were given. Accordingly, Tolbert's third assignment of error is without merit.

VI.
Tolbert argues that the Circuit Court committed reversible error when it refused to grant a new trial upon discovery that the father of one of the jurors had been murdered.
After the trial Tolbert discovered that the father of Juror Danny Joe Gurley had been murdered in December of 1982, approximately two years before this trial. The assailants on that occasion were convicted in the Circuit Court of Alcorn County and the death sentence of one has been upheld on appeal. See Cabello v. State, 471 So.2d 332 (Miss. 1985). Tolbert sought a new trial on the grounds that Gurley's service on the jury deprived him of a fair trial.
Here, neither the State, Defendant nor the Circuit Court asked during voir dire the specific question whether any prospective juror had a close family member who had been the victim of a crime. However, the prosecution, defense and court asked a general "catch-all" question of the jurors. Specifically, the Circuit Court asked the jurors whether any of the attorneys had
been involved in the prosecution of any case that you had some idea or interest about and aggravated you that they were involved in that?
The Circuit Court overruled Tolbert's motion for a new trial, stating in pertinent part:
[T]he court having considered the motion of the defendant for a new trial in this case on each of the grounds assigned *1377 therein, is of the opinion that as to the ground relative to the juror participating in the trial of this case, I will first make the observation that I certainly had no knowledge or reason to understand or believe that Mr. Gurley was related in any way to the victim in the Cabello case. Each of the questions that I asked in the nature of catch-all was, of course, to elicit anything which tended to bother any prospective juror or anything that he or she thought would interfere with his ability to fairly and impartially try the case as I would the questions by the State and the defendant. It is unreasonable for us not to assume that the juror by his not responding was in fact responding that there was nothing that would cause any problems with him sitting as a juror in this case while it might very well have been that you would have exercised a peremptory challenge or possibly had it been developed and the question been asked, that you would have asked that he be excused for cause, we will never know. The questions were not asked. The cases which the defendant has cited all relate to cases involving direct questions not answered by prospective jurors. Now when it would seem obvious that in the normal understanding of spoken English, the juror would comprehend the information you were seeking and the subject matter and in honesty and fairness that juror would have had to respond and give the information later developed. In this case each of us, including myself, the State attorney and the attorney for the defendant, used a question which was designed to cover all bases so to speak. No one ever asked the question. The cases cited by defense counsel certainly give us some guidelines but I do not feel that it controls this case. I cannot attribute to this juror something which he was not asked about which he did not make a response. As to that particular assignment for cause for a new trial, I do not believe that there is sufficient grounds upon which to grant a new trial in this case.
When a prospective juror in a criminal case fails to respond to a voir dire question by defense counsel,[6] the judicial inquiry is threefold:
(1) whether the question was relevant to the voir dire examination (2) whether it was unambiguous (3) whether the juror had substantial knowledge of the information sought to be elicited.
Logan v. State, 465 So.2d 339, 340 (Miss. 1985); Barker v. State, 463 So.2d 1080, 1083 (Miss. 1985); Dorrough v. State, 437 So.2d 35, 36 (Miss. 1983); Laney v. State, 421 So.2d 1216, 1217 (Miss. 1982); Adkinson v. State, 371 So.2d 869, 870 (Miss. 1979); Dase v. State, 356 So.2d 1179, 1181-82 (Miss. 1978); Brooks v. State, 360 So.2d 704, 706 (Miss. 1978); Odom v. State, 355 So.2d 1381, 1383 (Miss. 1978).
Odom originated the guidelines and then said:
If the trial court's determination of these inquiries is in the affirmative, the court should then determine if prejudice to the defendant in selecting the jury reasonably could be inferred from the juror's failure to respond. If prejudice reasonably could be inferred, then a new trial should be ordered. It is, of course, a judicial question as to whether a jury is fair and impartial and the court's judgment will not be disturbed unless it appears clearly that it is wrong. (citation omitted)
It is readily evident that no firm, unbending rule can be laid down that would control every situation that might arise on the voir dire of prospective jurors. Therefore, each case must be decided on an ad hoc basis considering the facts then before the court.
355 So.2d at 1383.
The questions asked were in the nature of "catch-all" questions, designed to elicit any information from jurors that would cause them not to be impartial. Gurley *1378 certainly had substantial knowledge of the information which through proper questions the attorneys were entitled to know. The fact not disclosed, however, would not per se have rendered Juror Gurley subject to a defense challenge for cause. That fact coupled with the ambiguity of the questions propounded by counsel and the Court are sufficient that we should deny the present assignment of error.

VII.
Tolbert argues that the Circuit Court erred when it allowed the witness, Roger Voyles, to testify. The basis of Tolbert's objection to Voyles' testimony was the witness' refusal to talk to defense counsel prior to trial.
Roger Voyles was Kat's next-door neighbor. Voyles claimed to have witnessed the incident, and testified accordingly. At the time of the first trial, Voyles was employed as a policeman in the City of Savannah, Tennessee, but was living in Corinth next door to Kat. For reasons unknown to us, Voyles did not testify at the first trial. He did, however, appear for the prosecution at this second trial.
Tolbert objected to Voyles' testimony because Voyles had refused to discuss his testimony with defense counsel prior to trial unless the District Attorney could be present during the interview. The Circuit Court overruled the objection, and Voyles was permitted to testify.
In Scott v. State, 359 So.2d 1355 (Miss. 1978), this Court stated:
A defendant's right to confer privately with witnesses should not be arbitrarily denied, provided the witness is willing to submit to questioning. (Emphasis added)
359 So.2d at 1358.
Further, this Court stated:
A defendant is entitled to access to prospective witnesses; however, this right exists co-equally with the right of a witness to refuse to say anything.
359 So.2d at 1360.
The Circuit Court lacks the authority to require a witness to submit to private examination by defense counsel where the witness is unwilling to talk with defense counsel. Blair v. State, 445 So.2d 1373, 1375 (Miss. 1984); Gallion v. State, 396 So.2d 621, 624 (Miss. 1981); Scott, 359 So.2d at 1375.
In the instant case Voyles was unwilling to submit to private examination by defense counsel unless the district attorney was present during such examination. This was Voyles' prerogative. Tolbert's remedy, if it be such, was to subject Voyles to cross-examination regarding possible bias, asking what Voyles had to hide. The Circuit Court, however, was well within its authority in overruling Tolbert's objection to Voyles' testimony.

VIII.
Tolbert questions the Circuit Court's refusal to allow the jury to view the scene of the homicide.
During the trial, photographs and diagrams were introduced into evidence portraying the scene. Thereafter, Tolbert asked for a jury view. The Circuit Court heard testimony and argument on the motion and denied it, finding that there was a reasonable probability that there had been a material change in the physical characteristics of the scene in the years since the incident. The court found that a view of the premises would likely confuse the jury.
Miss. Code Ann. § 13-5-91 (1972) gives the trial court discretionary authority to enter an order providing for the court and jury to view or inspect the place at which the offense has allegedly been committed. The same discretionary authority exists in the civil context as well as the criminal. See Seismic Petroleum Services, Inc. v. Ryan, 450 So.2d 437, 441 (Miss. 1984); National Box Co. v. Bradley, 171 Miss. 15, 28, 157 So. 91, 93 (1934). We will reverse only in the event of a clear abuse of discretion.
Here the scene of the incident was established by photographs, diagrams and testimony verifying each of these sources. Given the fact that the scene was reconstructed via these means and that over three *1379 years had elapsed since the incident occurred, we may not hold that the Circuit Court abused its discretion in refusing to allow the jury to view the scene of the accident.
The assignment of error is denied.

IX.
Prior to trial, Tolbert moved for the production of the statements of all witnesses who would testify on behalf of the State. He complains here of the Circuit Court's refusal to order disclosure of the pre-trial statement of Roger Voyles.
The Voyles statement was in fact delivered to the Circuit Court and viewed in-camera. This statement, given by Voyles to Mac Miller at the District Attorney's office on May 17, 1984, mirrored the testimony Voyles gave at trial. We have inspected the statement and find no inconsistency between Voyles' statement viewed in-camera and the testimony Voyles presented at trial. Accordingly, we are unable to say that the Circuit Court abused its discretion when it refused to permit Tolbert to examine the statement. See Rule 4.06, Miss.Unif.Crim.R.Cir.Ct.P.; Barnes v. State, 471 So.2d 1218, 1221 (Miss. 1985); Barnes v. State, 460 So.2d 126, 133-35 (Miss. 1984); Patrick v. State, 285 So.2d 165, 167 (Miss. 1973).
The assignment of error is denied.
CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT
AFFIRMED.
WALKER, C.J., ROY NOBLE LEE and HAWKINS, P.JJ., and DAN M. LEE, PRATHER, SULLIVAN, ANDERSON and GRIFFIN, JJ., concur.
NOTES
[1] This is the second appearance of this case before this Court. Tolbert's first conviction of murder was reversed and the matter remanded to the Circuit Court for a new trial. Tolbert v. State, 441 So.2d 1374 (Miss. 1984). This appeal has been taken from the judgment of conviction entered at Tolbert's second trial.
[2] The neutron activation analysis is a method of chemical analysis used to detect the presence of certain chemicals. By conducting this analysis on material obtained from one's hand, it can usually be determined whether that person shot a gun.
[3] The new Mississippi Rules of Evidence became effective January 1, 1986. Under the new rules, character evidence of a victim in a criminal trial is generally inadmissible unless the accused offers evidence of a pertinent trait of the victim's character. See Rule 404(a)(2) Miss. R.Ev.; McCormick, Evidence § 193 (3d ed. 1984). However, since this trial was conducted pre-rules, this Court must address the alleged error accordingly.
[4] See Annot., What Constitutes "Custodial Interrogation" Within Rule of Miranda v. Arizona Requiring That Suspect Be Informed Of His Federal Constitutional Rights Before Custodial Interrogation, 31 A.L.R.3d 565, 579-81 (1970 & Supp. 1986).
[5] The "accusatory stage" is reached when the law enforcement arm of the state first charges the accused with a crime. A charge may be formally made when a warrant is issued for the arrest of the accused. Miss. Code Ann. § 99-1-7 (1972). It may be made less formally when, acting without a warrant, law enforcement authorities place an accused under arrest.
[6] The general rule is stated in terms of responses to questions asked by defense counsel. There seems to be no logical reason why the same rule should not apply to questions asked by the court and the prosecution as well.