# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 95-KA-00215-SCT

*CALVIN BANKS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/20/95 |
| TRIAL JUDGE: | HON. JOHN M. MONTGOMERY |
| COURT FROM WHICH APPEALED: | CLAY COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | DAVID W. LAMBERT |
| | RICHARD BURDINE |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: WAYNE SNUGGS |
| | BY: CHARLES W. MARIS, JR. |
| DISTRICT ATTORNEY: | FORREST ALLGOOD |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 12/8/97 |
| MOTION FOR REHEARING FILED: | 1/8/98 |
| MANDATE ISSUED: | 10/1/98 |

**BEFORE SULLIVAN, P.J., PITTMAN AND BANKS, JJ.**

**BANKS, JUSTICE, FOR THE COURT:**

¶1. This appeal challenges the validity of a conviction of capital murder and a sentence of life imprisonment. After careful review of the circuit court proceedings, we conclude that the admission of an item of physical evidence that alone tied Banks to the crime, and which neither Banks nor his correlative expert were able to examine, rendered his trial fundamentally unfair. Accordingly, we reverse the conviction and corresponding sentence under ***Tolbert v. State***, 511 So. 2d 1368 (Miss. 1987).

I.

¶2. On January 20, 1995, Calvin Banks was found guilty of capital murder in the course of a robbery of Amy Ware in Clay County, Mississippi. After the jury was unable to agree on a sentence, he was

given life imprisonment. The circumstantial evidence adduced at his trial tended to show that Banks had been gambling in a card game with some friends not far from the home of the victim for most of the afternoon of August 14, 1993, the day she was murdered. After complaining of having run out of money, Banks left the card game around 4:00 to "go get some more money." He returned to the game with a paper bag in his hand and resumed playing cards.

¶3. Banks had been acquainted with the victim previously; she used to make lunch for him and had agreed to keep a few of his belongings while he was homeless and trying to find a place to stay.

¶4. The only evidence that could conceivably tie Banks to the crime was the testimony of a witness who saw him step off the victim's porch around the time she is assumed to have died and part of a bologna sandwich found at the crime scene the day after the murder. The State's expert witness testified that although Banks' teeth correlated with the bite marks in the remaining portion of the sandwich he could not say with any degree of certainty that Banks had bitten the sandwich.[1] Although fingerprints not belonging to the victim were found at the crime scene, none matched Banks'. Likewise, although hairs that appeared not to belong to the victim were found at the crime scene, none of the hair came from Banks.

¶5. The defense case consisted of the testimony of one of the victim's neighbors, who said that she passed by the deceased's home some time after Banks was known to have returned to his card game. She saw that the wooden door to the victim's home was open; when the victim was found, her door was shut and locked. Banks also put on his own dental expert who testified that he could not draw any conclusions from the photos made of the bites in the bologna sandwich. The expert also testified that he could not exclude the victim from the spectrum of people who could have made the bites in the sandwich, nor could he conclude who had made the bites as between the victim and Banks.

¶6. Following the denial of his motion for judgment notwithstanding the verdict, Banks appealed his conviction and sentence.

## II.

¶7. Banks argues that the trial court erred in admitting evidence about the bologna sandwich that was found at the scene. Banks moved to suppress the evidence at trial because the State's expert destroyed the sandwich before Banks or any of his experts could examine it. The State's expert took several photographs of the sandwich and made blow-ups of the photographs, which he later gave to Banks to examine, but the expert threw away the actual sandwich. The State argued at the hearing on the suppression motion that the sandwich was thrown away because it was perishable. In response to Banks' suggestion that the State could have simply frozen the sandwich, the State notes that its expert determined that freezing would destroy the sandwich as well, since some test bologna had dehydrated and shriveled when he froze it.[2] The State does not address the fact that the sandwich had been frozen before it was given to its expert for analysis in the first place.

¶8. The trial court denied the motion to suppress the sandwich, finding that the State had not destroyed the sandwich in an intentional attempt to deprive Banks of an opportunity to see it. The court was further satisfied that Banks would be allowed to cross-examine the State's expert and that Banks had found an expert who would be able to refute and rebut the State's evidence, notwithstanding the fact that Banks' expert was unable to examine the sandwich.

¶9. Banks presently argues that, since he was not allowed to examine the sandwich, the trial court should have excluded all evidence about it. He further argues that the evidence should not have been allowed because it was more prejudicial than probative, in violation of M.R.E. 403, and that its admission violated his rights under the Confrontation Clause. Banks' expert testified at trial that he would have preferred to have seen the sandwich in three dimensions and examined the thickness, etc. He opined that he then could have made a more thorough expert assessment. As such, Banks argues that his expert necessarily seemed less credible to the jury than the State's expert, who opined from the vantage of having seen the sandwich in three dimensions.[3]

¶10. The State responds that Banks' reliance on Rule 9 of the Uniform Rules of Circuit and County Court, which requires the State to produce to the defendant any physical evidence for inspection, testing, etc., is procedurally barred because Banks did not cite the rule when he made his motion to suppress. The State further argues that the trial court did not abuse its discretion in determining that the evidence was more probative than prejudicial and that the Confrontation Clause applies to witnesses rather than physical evidence. Finally, the State responds to the merits of Banks' contention, arguing that the sandwich would have not been exculpatory in anyway and that Banks' expert had the benefit of the photographs.

¶11. We conclude that, even if Banks did not cite URCCC Rule 9.04 in his motion to suppress during his trial, he raised and preserved the fundamental issue on this point, which is that his due process rights were violated by the State's destruction of the sandwich before he could examine it. The rule governing the State's destruction of physical evidence is discussed in *Tolbert v. State*, 511 So. 2d 1368, 1372 (Miss. 1987), in which this Court held that the State's duty to preserve evidence is limited to evidence that is expected to play a significant role in the defense. To play a constitutionally significant role in the defense, the exculpatory nature of the evidence must have been (1) apparent before the evidence was destroyed and (2) of such a nature that the defendant could not obtain comparable evidence by other reasonable means. *See also California v. Trombetta,* 467 U.S. 479, 489, 104 S.Ct. 2528, 2534, 81 L.Ed.2d 413, 422 (1984); *Johnston v. State*, 618 So. 2d 90, 92 (Miss. 1993).

¶12. The sandwich played a constitutionally significant role in Banks' defense and therefore this issue has merit. Although Banks is entitled to no presumption since the trial court found (on substantial evidence) that there had been no showing of any intentional effort on the part of the State to deprive the defendant of a view of the sandwich, it nevertheless seems that the bologna sandwich was obviously significant to the defense. The State's expert, Dr. Michael West, could not conclude with any degree of certainty at the close of his expert analysis that Banks had bitten the sandwich. His failure to reach this conclusion was not because of any inherent uncertainty on his part as to the validity of dental-impression analysis; indeed, West asserted that an individual's dental patterns are as unique as his fingerprints, although he testified that different materials receive those impressions in varying degrees of detail. The expert simply could not make any conclusive findings about the marks in the sandwich. He found merely that Banks' teeth were consistent with the marks in the sandwich, and that the victim's teeth did not appear to be.[4]

¶13. Contrary to the State's suggestion that the exculpatory nature of this evidence was not apparent before its destruction, Dr. West's failure to make a conclusive determination about the bites in the sandwich was exculpatory and obviously was apparent to him when he destroyed the sandwich.

Additionally, the State's excuse -- that the expert destroyed the sandwich because it was perishable and would be rendered useless upon freezing according to his test on some other bologna -- is unavailing. The State concedes that the sandwich was frozen before it was ever given to the expert in the first place, and, this same expert, who stated that freezing the sandwich would have rendered it useless, found the previously frozen sandwich useful enough to conduct *his* tests.

¶14. Moreover, the testimony about the bite marks in the sandwich was *central* to the State's and defendant's case, as it is the only evidence that purportedly placed Banks in the victim's house near the time of her death. Although an eyewitness testified that she saw Banks on the victim's porch around the time the victim is assumed to have been killed,[5] there is no other evidence placing him in the house. Neither the fingerprints nor the hairs found at the scene of the crime belonged to Banks or the victim.[6] Indeed, the victim had eaten a small amount of bologna, consistent with the amount bitten off the sandwich, shortly before her death. In this evidentiary context, the credibility advantage that was enjoyed by the State's expert, since his results were based on an actual inspection of the sandwich, takes on substantially greater significance. *Cf. **Tolbert**,* 511 So. 2d at 1373 (finding no due process violation where State destroyed particle of skin which could not have sustained defense theory of the case in context of all the evidence); *cf. also **Johnston**,* 618 So. 2d at 92-93 (finding no due process violation where State lost physical evidence that was not germane to State's case and did not corroborate or otherwise prove defense theory of alibi). Unlike the circumstances in ***Tolbert*** and ***Johnston***, the prejudicial impact of the State's destruction of the sandwich on the persuasive value of Banks' case is plainly apparent, and Dr. West's destruction of the sandwich was unnecessary and inexcusable.

¶15. The second prong of the test is more difficult for Banks. This prong requires him to show that the evidence is of such nature that comparable evidence could not be obtained by other reasonable means. Banks was given access to all the models and photographs made by the State's witness. His analysis can perhaps be considered "comparable" inasmuch as he used the same photos and things that the State's expert utilized in his analysis and testimony.

¶16. On the other hand, the weight of the analysis done by Banks' expert was distinctly disadvantaged by the failure of his testimony to arise out of an actual inspection. To simplify his testimony, he looked at some (two-dimensional) pictures of the actual sandwich, compared them with real samples made from denture models of the victim and Banks' teeth and samples from a smattering of his acquaintances who had varying teeth patterns. From this analysis, the expert concluded that it was "very difficult to tell who bit it." He discovered from the bite samples that he and his associates made in bologna sandwiches that it was very difficult to match the bites with the correct person. He therefore concluded that the sandwich in this case could have been eaten by either the victim or Banks.

¶17. Banks' expert conceded that he did not know whether a visual inspection of the sandwich after it had been frozen the second time would have caused him to render a different opinion, although he stated his conclusions would have been more certain had he been able to examine the thickness of the bologna and the bite marks. In a case where the relative weight of the experts' contrary testimony is so critical, Banks had no comparable vantage from which to opine contrarily to Dr. West's expert testimony about the bite marks.[7] In this case, even though the missing evidence can be said to possibly have bolstered the substance of the defense expert's opinion, the authority of a visual

examination would have undoubtedly bolstered the weight of that opinion more. Although the trial court rested its decision to admit the State's evidence about the sandwich in part upon Banks' opportunity to have an expert testify to the contrary, Banks was denied the opportunity to contradict the weight of the opinion given by the State's expert. The State's expert was afforded added credibility due to his having viewed the sandwich and having created the very evidence that Banks was forced to rely upon. We conclude that the admission of the evidence about the bologna sandwich rendered the trial fundamentally unfair, and the conviction should be reversed on this ground.

III.

a.

¶18. As an additional matter, we feel compelled to discuss certain issues which are likely to recur should this case be tried again.

¶19. Banks argues the trial court erred because it admitted certain testimony from Homer Ivy, a witness who visited Banks in jail prior to trial. Ivy went to the jail, as he did regularly with his pastor and other members of his church, to spiritually assist inmates at the Clay County jail. During the course of meeting with the inmates and discussing their Christian duties to forgive in order to be forgiven, Ivy met with several inmates and was called over by Banks. Apparently Banks asked Ivy whether one had to forgive someone who had killed his mother or father. Ivy reiterated his belief that one could not decline to forgive another for anything and still claim to serve God. At the close of their conversation, Banks shook Ivy's hand and stated, "You have got to forgive all."

¶20. Banks objected to the admission of this statement on the ground that it was a privileged communication to a clergyman pursuant to M.R.E. 505. During voir dire of the witness, Ivy testified that he served as a deacon in his church and visits the jail regularly with other members of his congregation. Ivy further testified that he did not discuss personal affairs with the inmates, but would leave that to the pastor or the elders. The trial court ruled Ivy was not a clergyman for purposes of M.R.E. 505.

¶21. Banks argues this ruling was erroneous, and additionally argues that admission of this statement violates his Sixth Amendment right to have an attorney present while being questioned. His argument is based on the fact that the jail allowed Ivy to visit Banks even though Ivy was, at the time, known to be a friend of the victim and witness for the prosecution. (Ivy testified to a number of the victim's habits and to having seen her on the day that she was killed). Banks alleges, without support, that Ivy went to see Banks in order to obtain a confession from him with the consent of the Clay County law enforcement.

¶22. Neither of these arguments has merit. Ivy is not a clergyman within the plain meaning of the definition of Rule 505, which states that "a 'clergyman' is a minister, priest, rabbi or other similar functionary of a church, religious organization, or religious denomination." M.R.E. 505(a)(1). Ivy testified quite clearly that he was not a minister and did not purport to be one, even though he did discuss spiritual issues in the abstract with people as a part of the exercise of his faith. He also testified that anyone from his church, not just deacons, could go and provide the same type of consolation to inmates. He expressly stated that he did not discuss personal problems with the inmates as part of his spiritual tutoring. Thus, we conclude that Ivy was not acting in the role of

minister within the plain meaning of the rule.

¶23. Banks' second argument is unavailing for two reasons. First, as the State notes, this argument was not raised below at any point and is therefore procedurally barred. *McNeal v. State*, 617 So. 2d 999 (Miss. 1993). Second, Banks has offered no proof that Ivy was operating as an agent of the State, such as to invoke the rule that the State may not contact a defendant who is represented by counsel. Therefore, this issue is without merit.

b.

¶24. Banks also argues that statements he made on the day before the murder to a witness, Tony Abshire, to the effect that Banks was a "dangerous man" who loved money and would do anything for it, were erroneously admitted into evidence over his objection. At trial, Banks objected to the statements on two grounds, Rule 404 and relevance. The court, however, overruled the objection and permitted the prosecutor to show that the statements proved "state of mind."[(8)] Banks argues on appeal that the statements were inadmissible hearsay, were more unfairly prejudicial than probative, and that they were character evidence and thus inadmissible under M.R.E. Rule 404. As to the last two grounds raised on appeal the State incorrectly argues the issue is procedurally barred. *See Smith v. State,* 656 So. 2d 95 (Miss. 1995) (whenever other crimes evidence is offered and objection to admissibility of such evidence is overruled, objection shall be deemed an invocation of objector's right to have probative value of evidence balanced against its prejudicial effect); M.R.E. 403, 404(b).

¶25. Beyond this, we note that Banks' original objections were correct and sufficient to exclude the evidence. The evidence is problematic under Rule 404. The part of the statement in which Banks describes himself as a "dangerous man" is obvious character evidence being used to suggest that the defendant acted in conformity therewith on a particular occasion. Nonetheless, the trial court allowed the questioning to continue after the Rule 404 objection, on the promise by the prosecutor that it would show the defendant's "state of mind." The statement that Banks "loved money and would do anything to get it" arguably comes closer to showing motive or intent if the witness's testimony were restricted to what the defendant said on the day before the murder. However, it is by no means clear from the record that Abshire's testimony was so restricted.

¶26. More importantly, the exceptions provided by Rule 404(b) expressly applies to "other crimes, wrongs, or acts." Banks' statement about his preoccupation with money is not evidence of any specific crime, wrong, or act. At most, it can be construed as an admission on Banks' part of certain traits consistent with a conceivable motive. The relevancy and admissibility of evidence are largely within the discretion of the trial court and reversal may be had only where that discretion has been abused. *Johnston v. State,* 567 So. 2d 237, 238 (Miss. 1990). Here, the trial court abused its discretion in permitting the prosecutor's attempt to show that Banks' prior statements were excepted under Rule 404(b) because they showed "state of mind."

c.

¶27. Finally, we are concerned that the trial court allowed the prosecutor to tell the jury during closing argument that while they had the opportunity to set Banks free, the prospect "that Banks will walk out of this courthouse was perhaps the most frightening part. . . ." This comment runs dangerously close to an argument based on the future danger Banks posed to society, rather than on

the facts adduced at trial.

¶28. Generally, attorneys on both sides in a criminal prosecution are given broad latitude during closing arguments. *Ballenger v. Mississippi,* 667 So. 2d 1242, 1269 (Miss. 1995); *Neal v. State,* 451 So. 2d 743, 762 (Miss.1984). Prosecutors are afforded the right to argue anything in the State's closing argument that was presented as evidence. *Blue v. State,* 674 So. 2d 1184, 1214 (Miss. 1996); *Hanner v. State,* 465 So. 2d 306, 311 (Miss. 1985) *citing, Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). However, arguing statements of fact that are not in evidence or necessarily inferable from it and that are prejudicial to the defendant is error. *Tubb v. State,* 217 Miss. 741, 64 So. 2d 911 (Miss. 1953). Thus, prosecuting attorneys should refrain from doing or saying anything that would tend to cause the jury to disfavor the defendant due to matters other than evidence relative to the crime. *Sumrall v. State,* 257 So. 2d 853, 854 (Miss. 1972).

¶29. This Court has held that, even at the sentencing phase of trial, it is impermissible to use appeals to the fears of juries. In *Williams v. State,* 544 So. 2d 782 (Miss. 1987), we held that a prosecutor's argument regarding the possibility of the defendant being paroled and the fact that another murder defendant had killed again while on parole constituted reversible error. An argument suggesting the "frightening" prospect of a defendant going free is similarly based on the prevention of future acts by the defendant rather than punishment for acts already committed, and such an argument is no less inappropriate at the guilt phase of trial. While this Court will consider allegedly improper comments in context, *Ballenger,* 667 So. 2d at 1270, we note that this argument highlights the improper "dangerous man" character evidence discussed above.

¶30. Should this case be retried, the trial court should ensure the parties refrain from arguing matters other than evidence relative to the crime or necessarily inferable from that evidence.

IV.

¶31. Because the admission of evidence about the bologna sandwich rendered the trial fundamentally unfair, the conviction and corresponding sentence is reversed.

¶32. **REVERSED AND REMANDED.**

**SULLIVAN, P.J., PITTMAN AND McRAE, JJ., CONCUR. LEE, C.J., CONCURS IN RESULT ONLY. SMITH, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY ROBERTS AND MILLS, JJ. PRATHER, P.J., NOT PARTICIPATING.**


**SMITH, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**



¶33. Once again, although given the opportunity, this Court refuses to recognize the reliability and admissibility of bite mark evidence as the Court has so held in two previous cases. *Howard v. State*, 697 So. 2d 415 (Miss 1997); *Harrison v. State*, 635 So. 2d 894 (Miss. 1994). Yet, in each of those cases, the Court used language within the text indicative of the importance of bite mark evidence

concerning a defendant's right to a fair and impartial trial. Here, as before, the majority discusses the importance of bite mark evidence and concludes that the "admission of the evidence about the bologna sandwich rendered the trial fundamentally unfair, and the conviction should be reversed on this ground." *Majority* at 9. I dissented on the two prior occasions and again find that I disagree with the majority on all issues.

¶34. As in *Harrison* and *Howard*, it is apparent that the majority here is merely concerned with the testimony and actions of the State's expert, Dr. Michael West. The issue in this case turns on the question of the State's destruction of physical evidence by Dr. West, i.e., the bologna sandwich. The rule governing such issue is discussed in *Tolbert v. State*, 511 So. 2d 1368, 1372 (Miss. 1987). *See also California v. Trombetta*, 467 U.S. 479, 489 , 104 S. Ct. 2528, 2534, 81 L.Ed. 2d 413, 422 (1984); *Johnston v. State*, 618 So. 2d 90, 92 (Miss. 1993). In *Tolbert*, the Court held that the destruction of evidence leads to an inference that the evidence was favorable to the defense only "where the spoilation or destruction was intentional and indicates fraud and a desire to suppress the truth." *Id*. at 1372 (*quoting Washington v. State*, 478 So. 2d 1028, 1032-33 (Miss. 1985)). This Court further required a two prong test to apply regarding destruction of evidence. In order for the disputed evidence to play a constitutionally significant role in the defendant's case, the exculpatory nature of the evidence must: (1) be apparent before the evidence was destroyed, and (2) be of such a nature that the defendant could not obtain comparable evidence by other means. *Id.*

¶35. *Tolbert* also dictates that an inference that the evidence was favorable to the defense exists only "where the spoilation or destruction was intentional and indicates fraud and a desire to suppress the truth." *Id.* at 1372 (*quoting Washington v. State*, 478 So. 2d 1028, 1032-33 (Miss. 1985)). Here, there is both an absence of fraud and of evidence of a desire to suppress the truth. The majority even admits that Banks "is entitled to no presumption since the trial court found (on substantial evidence) that there had been no showing of any intentional effort on the part of the State to deprive the defendant of a view of the sandwich." *Majority* at 5-6. Dr. West, the State's expert, could not conclude with any degree of certainty at the conclusion of his examination of the sandwich, whether Banks had in fact bitten the sandwich. He could only state that Banks' teeth were consistent with the marks made in the sandwich. He also concluded that the victim's teeth marks did not appear to have made the marks. Banks meeting of the first *Tolbert* prong is certainly questionable.

¶36. However, regarding the second *Tolbert* prong, there can be no question that Banks wholly failed to meet the requirement. Even the majority admits that "[t]he second prong of the test is more difficult for Banks." *Majority* at 8. Banks must show that comparable evidence could not be obtained by other reasonable means. The majority admits that Banks had access to photos and models as did Dr. West, but writes that Banks expert was "distinctly disadvantaged by the failure of his testimony to arise out of an actual inspection." *Majority* at 8. It is not at all clear in the case *sub judice* that the sandwich in question was in any way exculpatory. Banks expert was not employed until a year and a half after the murder. Banks expert conceded that he did not know whether freezing the bologna for that length of time "would have helped in this case or not." The most important factor ignored by the majority is that Banks expert did indeed contradict the State's expert opinion that Banks teeth made the marks in the bologna sandwich. This was exactly the point upon which the trial court based its decision. Banks had the benefit of comparable evidence which enabled his expert to contradict the State's expert. There is no merit to Banks claims.

¶37. Contrary to the majority, the bologna sandwich was not the only evidence which directly placed Banks at the scene of the crime at the approximate time of the commission of the murder. One of the victim's relatives had come by her house shortly prior to 5:00 o'clock p.m., knocked on the door and received no answer. The victim had been home earlier in the afternoon. An eyewitness testified that she saw Banks on the victim's porch around the time the victim was assumed to have been killed. Surely, that was sufficient evidence for a jury to find that Banks was on the scene at approximately the time of death of the victim.

¶38. Banks' employer, Tony Abshire testified that a day prior to Mrs. Ware's murder, Banks informed him that he, Banks, was a dangerous man, and that the people of West Point were going to know who he was. Additionally, there was testimony to the effect that Banks "loved money and would do anything to get it." The State offered such evidence to show state of mind and motive or intent. Even the majority admits that the second disputed statement regarding love of money comes closer to showing motive or intent. *Majority* at 13. "[R]elevancy and admissibility of evidence are largely within the discretion of the trial court and reversal may be had only where that discretion has been abused." *Johnston v. State*, 567 So. 2d 237, 238 (Miss. 1990). Banks admits in his brief that the statements that he made to Abshire are "probably relevant." Thus, the only remaining question here, is whether its probative value is substantially outweighed by the danger of unfair prejudice. Practically all evidence offered by the State against a defendant is arguably somewhat prejudicial. The ultimate issue turns on the question of what the words "substantially outweigh" and "unfair prejudice" actually mean. There is nothing unfair about these statements voluntarily made by Banks to his employer. Rash, irresponsible, bold participation on Banks' part, yes, but not unfairly admitted as evidence against him to show state of mind, motive and intent.

¶39. Finally, the majority finds fault with the prosecutor's closing argument wherein the prosecutor was commenting on the jury having the opportunity to set Banks free and the prospect "that Banks will walk out of this courthouse was perhaps the most frightening part." The majority claims that this argument stresses the "future danger Banks posed to society, rather than on the facts adduced at trial." *Majority* at 13. I fail to find any support in this record including the foregoing statement that would aid the majority in concluding that the prosecutor was referring to Banks "future dangerousness".

¶40. Attorneys on both sides in criminal cases are given broad latitude during closing arguments. *Ballenger v. State*, 667 So. 2d 1242, 1269 (Miss. 1995); *Gray v. State*, 351 So. 2d 1342, 1346-47 (Miss. 1977). Of course, "[p]rosecutors are afforded the right to argue anything in the State's closing argument that was presented as evidence." *Blue v. State*, 674 So. 2d 1184, 1214 (Miss. 1996).

¶41. Here, Banks appears to have no complaint about the content of the prosecutor's statement, but rather objects to the manner in which it was stated, too softly, as if intended only to be heard by the jury. (Banks' brief). It was a legitimate argument for the prosecutor to depict Banks as the murderer, based on the overwhelming evidence adduced during trial. The record contained such evidence and reasonable inferences therefrom showing Banks to be the killer. The supposed improper statement was nothing more than the obvious, there was more than sufficient evidence to convict Banks, and the jury should not allow the unthinkable to occur, i.e., Banks going free.

¶42. The proper test to be applied here is "'whether the natural and probable effect of the improper

argument of the prosecuting attorney is to create an *unjust prejudice* against the accused as to result in a decision influenced by the prejudice so created."' ***Ormond v. State***, 599 So. 2d 951, 961 (Miss. 1992), (*quoting **Davis v. State***, 530 So. 2d 694, 701 (Miss. 1988)), *citing **Craft v. State*** 226 Miss. 426, 84 So. 2d 531 (1956). Applying such test to the prosecutor's statement in the case at bar, easily leads to a conclusion that the comments in question absolutely did not result in unjust prejudice but rather merely reflected the overwhelming and compelling evidence against Banks. The majority is simply reading too much into these prosecutorial comments and unduly restricting the right of counsel to comment upon evidence adduced during trial.

¶43. I respectfully concur in part and dissent in part.

**ROBERTS AND MILLS, JJ., JOIN THIS OPINION.**

1. Indeed, the autopsy of the victim revealed that she had eaten bologna shortly before she was killed.

2. The State's expert apparently bought some bologna to test the freezing process. After seeing it shrivel, he decided to throw the rotting bologna away. That expert conceded, however, that the sandwich had been frozen when he received it and before he analyzed it.

3. Banks further notes that the State's expert had been previously reprimanded by the American Academy of Forensic Sciences for destroying evidence before the opposing expert could examine it.

4. Dr. West, the State's expert, conceded that he could not make a natural bite impression with the victim's teeth, since she was of course deceased. He used her upper denture and a model of her lower teeth to attempt to recreate the victim's bite into bologna. He also conceded that one's natural bite into a sandwich could easily produce quite different marks from those made artificially, especially in a piece of soft meat that is layered between bread.

Dr. West further noted that he had not actually taken any photographs of the victim's teeth against the bitten bologna, as he had done with the model of the defendant's teeth. (These photos purported to demonstrate the correlative points between Banks' teeth and the bologna bites). Thus, Banks' expert had to compare the actual model of the victim's dentures with the photographs of the actual bologna.

5. The State determined that the victim must have been killed some time before 5:00 p.m., when one of her relatives came by and knocked but got no answer. She was home earlier that afternoon; however the State was unable to determine the time of death with any more precision than that.

6. A picture of Banks that appears in a newspaper article in the record reveals that he had hair, at least at the time of his arrest.

The State suggested during closing argument that the paper bag Banks brought back to the card game contained the clothes the victim had been keeping for him, which he retrieved from her home during the course of the robbery-murder. However, no evidence was introduced that tied the paper bag to the crime. None of those people who were at the card game and testified at the trial knew

what the paper bag contained. The State did not introduce the paper bag into evidence.

7. This Court has expressed concern about bite mark evidence. ***Howard v. State***, 697 So. 2d 415, 429 (Miss. 1997) (holding unreliable and inadmissible bite mark comparisons of bites in living flesh, further holding that all bite mark evidence must be open to wide-ranging attack by defense counsel).

8. Apparently, this was accepted as a valid attempt to show that the evidence fit within the exception provided by Rule 404(b).