754 So.2d 506 (1999)
Robert LINDSEY, Jr., Appellant,
v.
STATE of Mississippi, Appellee.
No. 98-KA-00217-COA.
Court of Appeals of Mississippi.
September 28, 1999.
Rehearing Denied January 11, 2000.
Certiorari Denied March 23, 2000.
*507 Thomas M. Fortner, Robert M. Ryan, Louis F. Coleman, Jackson, Attorneys for Appellant.
Office of the Attorney General by Scott Stuart, Attorney for Appellee.
BEFORE KING, P.J., IRVING, AND LEE, JJ.
IRVING, J., for the Court:
¶ 1. On the night of May 14, 1994, Giles Bryant was shot shortly after he dropped his son off at the Yana Club around 9:55 p.m. The Yana Club is located on Hartfield Street, just off State Street in Jackson, Mississippi. Bryant died a short time later at the University of Mississippi Hospital. Robert Lindsey, Jr., Jason Lomax, Latarsha Brown and Latasha Stuckey were indicted for armed robbery and capital murder in connection with Bryant's death. Pursuant to a plea agreement with the State, Lomax, Brown and Stuckey pled guilty to lesser offenses, and Lomax and Brown, along with several other witnesses, testified against Lindsey. Lindsey did not testify in his own behalf, as was his right not to, but offered an alibi defense through several witnesses. He was convicted of Bryant's murder and sentenced to life in prison. Following denial of his motions for JNOV and new trial, Lindsey appealed his conviction and sentence to this Court assigning the following as error:
I. THE TRIAL COURT ERRED IN OVERRULING DEFENSE OBJECTION TO OTHER CRIMES TESTIMONY FROM STATE WITNESS ABRAHAM RICHARDSON AS SUCH EVIDENCE WAS WHOLLY UNNECESSARY FOR PURPOSES OF IDENTIFICATION AND WAS ADMITTED IN VIOLATION OF RULE 403 AND 404 OF THE MISSISSIPPI RULES OF EVIDENCE AND AS A RESULT, LINDSEY WAS DENIED A FUNDAMENTALLY FAIR TRIAL BY A FAIR AND IMPARTIAL JURY CONTRARY TO THE RELEVANT PROVISIONS OF THE UNITED STATES AND MISSISSIPPI CONSTITUTIONS.
II. THE TRIAL JUDGE ABUSED HIS DISCRETION IN NOT GRANTING DEFENSE MOTION TO TRANSPORT THE TRIAL JURY TO THE CRIME SCENE AS THE SAME WAS CRITICAL FOR THE PROPER CROSS-EXAMINATION AND CREDIBILITY IMPEACHMENT OF KEY STATE IDENTIFICATION WITNESS MARY AZEBEOKHAI.
III. THE TRIAL COURT ERRED IN ALLOWING IMPROPER *508 TESTIMONY CONCERNING THE UNRELATED THEFT OF A VEHICLE PRIOR TO THE SHOOTING AND ARMED ROBBERY OF THE VICTIM GILES BRYANT.
IV. THE TRIAL COURT ERRED IN ADMITTING UNFAIRLY PREJUDICIAL TESTIMONY CONCERNING THE ALLEGED THEFT OF A PISTOL FROM THE VEHICLE OF KENNETH BARNES AS THE SAME WAS TOTALLY UNRELATED TO THE INDICTED CHARGE AND WAS ADMITTED CONTRARY TO THE PROVISIONS OF RULES 403 AND 404 OF THE MISSISSIPPI RULES OF EVIDENCE AND AS A RESULT, LINDSEY WAS DENIED A FUNDAMENTALLY FAIR TRIAL AS GUARANTEED BY THE UNITED STATES AND THE MISSISSIPPI CONSTITUTIONS.
V. THE OFFERING OF PROMISES AND THE RESULTING IMPOSITION OF REDUCED SENTENCES TOGETHER WITH THE ABSTENTION FROM THE PROSECUTION OF CAPITAL CHARGES IN FAVOR OF CO-DEFENDANTS LOMAX, STUCKEY AND BROWN IN EXCHANGE FOR THEIR INCULPATORY TESTIMONY AGAINST LINDSEY WAS IN VIOLATION OF THE MISSISSIPPI BRIBERY STATUTE, TO-WIT: SECTION 97-9-7, MISSISSIPPI CODE OF 1972.
¶ 2. Finding no reversible error we affirm.

FACTS

The State's Case
¶ 3. Some of the evidence presented by the State will be set forth here while other evidence, including the testimony of Lomax, Abraham Richardson and Kenneth Barnes, will be presented during our discussion of M.R.E. 404 and 403 other crimes issues.
¶ 4. On May 14, 1994, Mary Azebeokhai resided at 236 Hartfield Street. Hartfield intersects with Downing Street. At the trial of this matter she testified that sometime after dark, while she and her boyfriend and some friends were sitting outside in her driveway eating fish, she heard two or three gunshots. Shortly after hearing the gunshots she saw two boys enter the intersection of Downing and Hartfield streets and stop suddenly underneath the streetlight. She stated that the taller of the two boys had a gun in his hand. She testified that she did not know the boy at the time but she was later able to pick him out of a lineup, and she made an in-court identification of Lindsey as the person she saw that night with the weapon in his hand.
¶ 5. Azebeokhai testified that the only description she could give of the individual with Lindsey was that he was "little".
¶ 6. At about the same time that Azebeokhai saw the two individuals under the streetlight, her boyfriend directed her attention to a white man across the street. She looked in the direction her boyfriend indicated and saw a white male going behind a storage building at the house across the street from her. She testified that the white male appeared to be trying to hide behind the building.
¶ 7. While she was observing the individual behind the storage building, a car drove up from the same direction as the two individuals at the intersection. The car stopped momentarily, but one of the individuals at the intersection gestured to the driver, who then drove the car farther down the street. Shortly thereafter, the two individuals walked away in the direction of the car.
¶ 8. By this time the white male had come across the street to Azebeokhai's house. Azebeokhai testified that the individual *509 said, "Please help me. I've been shot. I'm dying." Azebeokhai asked her neighbor to summon help and an ambulance and the police were called. The first police officer on the scene testified that he was dispatched to the scene at 10:18 p.m. Giles Bryant was taken to the University Medical Center where he later died.
¶ 9. Azebeokhai testified that her first identification of Lindsey was of a photo. Her impression was that the individual was a "very young man." She later learned that the picture she picked was one of Lindsey at a younger age. At the time of the incident Lindsey was seventeen years of age.
¶ 10. On the night of May 14, 1994, L.B. Wells was sitting in his pickup truck parked in the driveway of his sister's house on Downing Street. At the trial, Wells testified that he was reclining in the cab of his truck waiting on his sister to come home when he heard somebody call for help. He said that he looked out the back of his truck in time to see a white male get shot. He also saw two black males, one of whom was tall and the other short. He was unable to see either of their faces. The taller of the two males had a gun in his hand and fired it several times. He said that the shooting took place directly behind his truck and that the white male ran between a couple of houses after being shot as if in an attempt to get away from the individual that shot him.
¶ 11. Wells further testified that after firing the gun, the tall black male kneeled down, picked something up from the ground, stood up, paused for a second, and started running. The shorter of the two black males also started running. As the two individuals ran past a white or beige car with a dark top, Wells saw one of them gesture to the occupants of the car and the car pulled off. The two individuals continued running north on Downing Street toward the intersection of Downing and Hartfield. Wells testified that he never saw the individuals stop at the intersection. His testimony was that they ran through the intersection and out of his sight without ever turning or looking back.
¶ 12. Doris Brown lived on the corner of Hartfield and Downing at the time of the shooting. She testified that she heard gun shots, rushed to the door and saw a beige and maroon car at the corner. She stated that there was a male individual on each side of the car and she heard one of the individuals say "[G]o ahead, man, go ahead." A moment later the two individuals got into the car and drove out of sight. Her description of the individuals was that one was tall the other short, and both were black. She said that the tall one had what she thought was a gun in his hand. She was never able to identify either individual.
¶ 13. Latarsha Brown, one of Lindsey's co-indictees was an inmate at the State Correctional Facility in Rankin County a the time of her testimony, serving a mandatory five year sentence on a guilty plea to armed robbery.
¶ 14. Brown testified that on the evening of May 14, 1994, some time after dark, she and a friend, Latasha Stuckey, encountered Lindsey and Lomax on Calhoun Street and got into a car with them. Brown stated that she got in on the front seat with Lindsey, who was driving, and Stuckey got in on the back seat with Lomax. She said that while traveling on Hartfield Street they drove past a man standing near a parked car.
¶ 15. Brown testified that they then stopped the car that they were in and Lindsey and Lomax got out of the car with the intention of robbing the man. She said that Lindsey had a silver-plated .380 and that Lomax probably had a gun but that she did not see one. Brown testified that as Lindsey and Lomax walked down the street she moved over to the driver's seat in the automobile. She said that she did not see what Lindsey and Lomax did but that she heard a man say "[P]lease don't kill me," and then she heard one gunshot. Brown testified that she then *510 drove the car down the street to pick up Lindsey and Lomax.
¶ 16. Brown stated that she moved over so that Lindsey could get into the driver's seat. She testified that Lindsey put the gun on the seat and she picked it up and it was "warm-like, like it had been shot."
¶ 17. Brown testified that in exchange for her testimony in this case she was allowed to plead guilty to a reduced charge of manslaughter and the State agreed to recommend that any sentence she might get for manslaughter run concurrently to the time she's now serving for armed robbery.
¶ 18. John Dial, a criminalist with the Forensic Services Unit of the Jackson Police Department Crime Lab testified that from his examination of the projectile that killed Giles Bryant he could neither include or exclude a Lorcin .380 pistol as the murder weapon.

The Defense's Case
¶ 19. The defense presented the testimony of Marvin Cooley, one of four people at witness Mary Azebeokhai's house on the night of the shooting. He testified that they were drinking beer and eating fish when they heard gunshots. Cooley testified that shortly after hearing the shots he saw two black individuals walk into the intersection. His description of them was that one was tall and the other was short but that was as much as he could see. He testified that he could not identify either of them from the distance he was standing.
¶ 20. Cooley's testimony was followed by a number of alibi witnesses, mostly members of Lindsey's family's church, who were present at the hospital on the night of the shooting to lend support to Lindsey's cousin, Maurice. Their testimony, including the testimony of Pastor Franklin McDuffie, placed Lindsey at the hospital at the time of the shooting.

ANALYSIS OF ISSUES PRESENTED

I. Other Crimes Evidence
¶ 21. For purposes of our analysis and discussion, issues I, II, and IV, as set forth by Lindsey in his brief, have been combined here into a single issue under other crimes testimony since each of the issues deals with other crimes allegedly admitted in violation of Rules 404(b) and 403 of Mississippi Rules of Evidence. Lindsey contends the trial court erred in admitting the testimony of Jason Lomax and Abraham Richardson. Although Kenneth Barnes testified concerning one of the same other crimes as did Lomax, Lindsey does not claim a Rule 404(b) or 403 error with regards to Barnes's testimony; however, as stated, he contends the trial court's allowance of Lomax's and Richardson's testimony was plain, reversible error and was clearly, contrary to the spirit of Rules 403 and 404(b).
¶ 22. Rule 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

Standard of Review
¶ 23. The applicable standard of review of this issue was set forth in Foster v. State, 508 So.2d 1111, 1117-18 (Miss. 1987), wherein the court instructed as follows:
When the trial court determines that a 403 factor substantially outweighs probative value, it is still within its discretion to determine whether to exclude the evidence, since 403 states not that the evidence must be excluded in such cases, but rather that it may be excluded.

*511 Because of this discretion vested in the trial court, our task as an appellate court reviewing a 403 determination is not to engage anew in the 403 balancing process. Rather, we simply determine whether the trial court abused its discretion in weighing the factors and admitting or excluding the evidence.

Other crimes evidence as related by Kenneth Barnes and Jason Lomax
¶ 24. Kenneth Barnes, Lindsey's maternal uncle, testified that on May 14, 1994, another of his nephews, Maurice, was shot. Barnes testified that he learned about the shooting from three children who came to his sister's house to notify the family. The sister was the mother of the shooting victim. Barnes testified that he left the house to find a ride to the hospital for the shooting victim's mother, then afterwards returned to the house to await the return of the shooting victim's mother's car, which had been borrowed by a friend. While Barnes was waiting, Lindsey came to the house with Jason Lomax. When the car was returned, Barnes, Lindsey and Lomax rode to the hospital together. Barnes testified that he had a gun, described as a .380 caliber Lorcin automatic, with him at the time which he stored underneath the car seat. Barnes also testified that the gun clip had six bullets in it and he described the gun as being chrome with a black handle and an eight to ten inch barrel.
¶ 25. Barnes testified that Lindsey also had a gun at the time which he thought was a .38 revolver. Barnes testified that it was just about dusk dark when they started out on the approximately two mile drive to the hospital, and was dark by the time they actually arrived at University Medical Center. Barnes testified that when he arrived at the emergency entrance he saw many of his family members standing outside. When he learned from other family members that his nephew was in surgery and expected to recover he did not go into the hospital right away and neither did Lindsey or Lomax.
¶ 26. Barnes testified that he stood around talking for some twenty to thirty minutes when he was asked by his sister, the shooting victim's mother, to return to the house and locate her other son and bring him to the hospital. He said that Lindsey and Lomax accompanied him on the drive back to the house where they spent five to ten minutes locating the son, then drove back to the hospital. Barnes testified that he left Lindsey and Lomax at the car at approximately 10:20 p.m., went into the hospital waiting room and watched Showtime at the Apollo television show which began at 10:30 p.m. Once the show ended, Barnes remembered that he left his gun in the car and went back to the car to check. He did not see either Lindsey or Lomax when he returned to the car nor was he able to locate the gun.
¶ 27. Barnes testified that he then drove around hoping to locate Lindsey and Lomax. He headed back to the neighborhood where he had picked them up earlier but the car he was driving stopped before he made it back. Barnes stated that he obtained the gun the following Monday from Lomax at Lomax's house, where Lindsey was staying.
¶ 28. A year and a half after the incident, Barnes gave a statement to the police saying that he'd had the gun a month when Lindsey "stole it from me." At trial he said that he could not remember giving that statement and changed his answer to say that he did not know who took the gun since it was returned to him by Lomax and not Lindsey. He said that he lost the gun when he left it under the car seat of one of many cars that he chauffeured for a legally blind man who would get a car from a car dealership to test drive for a while, return it, and get another one. The gun was never produced.
¶ 29. Jason Lomax testified that in May 1994, he was thirteen years old, four feet six inches tall and weighed eighty-four pounds. Lindsey was six feet tall. Lomax *512 testified that on May 14, 1994, he, Lindsey, Kenneth Barnes and another of Kenneth Barnes's nephews rode in a car to the University Hospital where Barnes's nephew, Maurice, was being treated for a gunshot wound. Lomax testified that after their arrival at the hospital, he and Lindsey milled around for a while then returned to the car that they rode in to the hospital. He said that Lindsey took the.380 from underneath the seat where Lindsey and Lomax had seen Kenneth Barnes store it. He said that he removed the .38 revolver that had also been placed under the seat, along with a belt, cellular phone and a five shot clip for the .380. He and Lindsey then walked across the street to the Holiday Inn, and Lindsey stole a car.
¶ 30. Lomax testified that Lindsey drove the car to Lomax's house on Calhoun Street where they picked up two females, Latarsha Brown and Latasha Stuckey, whom they saw walking. They then drove north on West Street toward Meadowbrook and turned right off of West Street near a Conoco service station. As they drove down the street Lomax said that they saw a white man standing at the back of a car who appeared to be going into the trunk. According to Lomax, Lindsey said, "[W]e gonna rob him."
¶ 31. Lomax testified that they drove around the corner, and he and Lindsey got out of the car with the weapons. Lindsey had the .380 and Lomax had the .38. They walked back to where the man was standing, and Lindsey demanded his money. The man asked Lindsey not to kill him and attempted to give him what money he had but, according to Lomax, the man was "shaking with it and stuff and dropped it." That was when Lindsey shot him twice. Lomax said he began running and so did the white man who ran behind a house. Lomax testified that Lindsey kneeled down, picked something up from the ground then ran behind him. He said that he and Lindsey both ran back to the car, got in, and drove off with Lindsey in the driver's seat.
¶ 32. Lomax also testified that he gave a statement to the police after the incident implicating Lindsey as the shooter and then a day later wrote a letter to Judge Graves saying that everything he told the police in his statement was a lie. On the stand he denied that the contents of the letter to the judge were true and testified that he only wrote the letter because he was afraid that Lindsey would be given the death penalty.
¶ 33. Lomax also denied that he and Lindsey made a second trip to the hospital that night with Kenneth Barnes. He testified that it was dark when they arrived at the hospital and that he and Lindsey only remained there for approximately thirty minutes.
¶ 34. Lomax testified that he made a deal in exchange for his testimony against Robert Lindsey in which the murder charge was reduced to manslaughter.
¶ 35. Lindsey contends that Jason Lomax's testimony regarding the theft of a pistol from the vehicle of Lindsey's uncle, Kenneth Barnes, and the theft of an automobile from a nearby Holiday Inn just prior to the Bryant robbery homicide served only to interject character evidence against him and to highlight to the trial jury that he had committed other bad acts. He further alleges that the testimony was unfairly prejudicial, had little probative value to the material issues being litigated and was unnecessary under any theory of telling a complete story. Lindsey also alleges that the trial court's failure to conduct a Rule 403 balancing analysis and give a cautionary instruction was reversible error. We disagree.
¶ 36. The trial court's ruling on Lindsey's motion to exclude Lomax's testimony proceeded as follows:
THE COURT: The court is persuaded that the evidence by way of the testimony of witness Lomax about the taking of a vehicle certainly goes to preparation in terms of preparing for the commission of a crime which apparently he's going *513 to testify was committed after the taking of that vehicle and it is evidence of a plan to carry out whatever was necessary in the furtherance of the commission of the crime which is the basis for the indictment that brings us all here. And so in applying Rule 404(b), in examining the exceptions which will allow that evidence of other crimes is admissible, the court is persuaded that as to the exceptions regarding preparation and plan, the evidence of the other crime is admissible pursuant to those exceptions and hence the motion for mistrial should be and is hereby denied. And motion to exclude any evidence of other crimes, specifically as it relates to the taking of the vehicle which according to the testimony of this witness immediately preceded the crime in this case, is admissible.
MR. COLLINS: I think the Court also has to make a ruling under rule 403 the probative value outweighs the prejudicial effect if Court deems that to be so.
THE COURT: Why?
MR. COLLINS: I think that's a requirement that even if it's admissible under 404(b) that the Court has to make a 403 ruling and I think the Court has done that in its statement but I think you have to come back and have a 403 ruling. That's the way I understand it.
MR. PETERS: In other words, what you have already said is a weighing process.
THE COURT: I hear that but I'm not convinced that I need to make some finding under 403 after I've applied 404(b) and made a finding that it's admissible. Have you got some law that says I've got to now apply 403.
MR. COLLINS: I think I could get some but I think the Court has done it. The only thing I think the Court hasn't done is mention Rule 403 which says that although relevant, which the Court has ruled, evidence may be excluded if the probative value outweighs the prejudicial value. I think the Court has said that but has not mentioned 403. I was just making that for the record in case it goes up.
THE COURT: All right, it's done for the record. You have made it. Anything further from the state?
¶ 37. It is apparent from this exchange that the trial judge was of the mind set that he had already gone through the necessary evidentiary analysis for admission of the evidence. However, the state was not as sure as the trial judge and brought to the judge's attention the need to be more specific and definite concerning the 403 balancing analysis following the ruling that the evidence was admissible under 404(b). We think it safe to assume that any doubt as to whether an analysis was done in this case by the trial judge, was removed following the exchange with the prosecutor where the prosecutor urged upon the court the specific need to do a 403 balancing analysis. This conclusion is buttressed by the following statement made by the trial judge after he was told of the need to do an on-the-record balancing analysis: "All right, it's done for the record." In other words, it appears to us that the trial judge considered the admissibility of the evidence under 404(b) and 403 in a one-step process instead of a two-step process as is required. See Smith v. State, 656 So.2d 95, 100 (Miss.1995), holding that "whenever 404(b) evidence is offered and there is an objection which is overruled, the objection shall be deemed an invocation of the right to MRE 403 balancing analysis and a limiting instruction. The court shall conduct an MRE analysis and, if the evidence passes that hurdle, give a limiting instruction unless the party objecting to the evidence objects to giving the limiting instruction." However, the Mississippi Supreme Court in Blue v. State, 674 So.2d 1184, 1222 (Miss.1996), (citing Foster v. State 508 So.2d 1111, 1117-18 (Miss.1987)), held that "since the balancing test is not mandatory by virtue of the word `may' in the rule, it is within the trial court's discretion to apply the *514 test." It appears Blue contradicts Smith in that Smith mandates a balancing analysis while Blue appears to say no such balancing test is mandatory. Although Blue was handed down after Smith, it did not explicitly overrule Smith. Therefore, we consider Smith still to be good law.
¶ 38. We are not aware of any Mississippi Supreme Court case mandating the consequences for a trial court not following the admonition in Smith, nor are we aware of any Mississippi Supreme Court case proscribing harmless error consideration by the appellate court when the trial court has failed to perform the required balancing analysis.
¶ 39. As stated, we believe a reasonable interpretation of the trial judge's comment while dealing with the on-the-record balancing issue is that he did in fact take into consideration the prejudicial effect versus the probative value of the testimony when he allowed the testimony. But even assuming the trial judge failed to do the balancing analysis, the record is sufficient for us to make a determination as to whether the trial judge abused his discretion in allowing the testimony.
¶ 40. At the stage of the proceedings when this evidence was offered by the State, a number of witnesses had already testified that gunshots were fired at the scene of the crime and a car carried away the suspected shooter. There had also been evidence that Lindsey and Lomax had ridden together in a car to the hospital but had not left the hospital in that car. There had also been evidence that there was at least one gun in the vehicle they rode in to the hospital. Lomax's testimony regarding the acquisition of the car and gun used to commit the crime was clear evidence of plan and preparation under Rule 404(b). It also aided in the telling of the complete story. Further, Lindsey's alibi defense was that he was at the hospital at or about the time the offense was committed. Hence, a gap in the time line by several minutesas would have been evident by a scenario giving the inference of Lindsey's walking to the scene of the crimewould have been extremely helpful to Lindsey's defense, and by contrast, very helpful to the State to show that Lindsey could have left the hospital and committed the crime without being missed for any extended period of time because he was riding. Certainly, it was probative and helpful to the jury to know and understand how Lindsey and his cohort got from the hospital to the scene of the crime. While it is true that it was neither necessary nor probative for the jury to know that Lindsey and Lomax traveled by way of a stolen car, it was helpful and probative as viewed from temporal proximity that the jury know they traveled by a means capable of getting them there in short order, and that means just happened to be a stolen car. We find that it was not an abuse of the trial court's discretion to admit this evidence. We also find that its probative value was readily apparent and its prejudicial effect minimal, for the other crimes about which Lindsey and Barnes testified are quite dissimilar from the offense charged which minimized the chance that the jury would conclude he was guilty of the offense charged because he had committed a similar offense in the immediate past.
¶ 41. Lindsey's contention that the trial court committed reversible error in failing to give a cautionary instruction is equally without merit. The trial court's instructions to the parties following his decision to allow the testimony was as follows:
THE COURT: I suspect there is some cautionary instruction that may be appropriately given to the jury and if either of you think it needs to be given immediately, then I invite you to bring back a proposed cautionary instruction when we return from the lunch break and I'll continue my reading and see whether or not my research leads to one. But I invite you to do it or at least have some research as to whether or not, one, a cautionary instruction is appropriate *515 and then, two, if it is what the instruction ought to be.
¶ 42. The court then recessed for lunch. When the court reconvened, the judge informed counsel for Lindsey that if he had any objection to the giving of a cautionary instruction that none would be given. Counsel was also advised that he could prepare whatever cautionary instruction he desired to be given and the court would give that instruction. The court then inquired of all counsel whether any had a proposed instruction to offer. Only the State offered an instruction. The court again questioned counsel for Lindsey as to his preference for the giving of an instruction or not. Lindsey's counsel responded as follows:
MR. FORTNER: I am not requesting it, Your Honor. I don't believe it can cure the error that's already been made.
No instruction was given.
¶ 43. The record is clear that the trial court used every means available to it to assure that the decision to give or not give a cautionary instruction was left totally to Lindsey.
¶ 44. Lindsey now argues that the trial judge was under a duty to give a cautionary/limiting instruction despite his counsel's comments that he was not requesting one. Lindsey asserts that the statement by his counsel that he was not requesting an instruction is not the same thing as lodging an objection, and that absent a specific objection to the giving of an instruction, the trial judge was required to give one, and his failure to do so requires reversal of Lindsey's conviction. This Court disagrees.
¶ 45. In support of his contention that the trial court's failure to give a cautionary instruction warrants reversal, Lindsey cites Smith v. State, 656 So.2d 95 (Miss. 1995). We point out that Smith does not mandate a reversal for failure of the trial judge to give a cautionary instruction even though we said as much in Moss v. State, 727 So.2d 720, 725 (Miss.Ct.App.1998). As stated earlier in this opinion, Smith does hold that once an objection is made to 404(b) evidence, as was done here, the trial court should sua sponte, give a limiting instruction unless objection is registered by the defense. However, neither Smith nor Moss precludes the harmless error analysis when a trial court fails to give the required instruction. We are loath to find error in light of counsel's statement to the trial court that he was not requesting an instruction, for, under the circumstances presented, we see little difference in saying "I am not requesting an instruction" and in saying "I do not want an instruction or I object to an instruction." In any event, we find the error, if any it was, harmless beyond question in view of the overwhelming weight of the evidence against Lindsey.

Other crimes evidence as related by Abraham Richardson
¶ 46. Abraham Richardson testified that during the early morning hours of May 15, 1994, he was robbed at gunpoint by an individual whom he later identified as Robert Lindsey. He testified that it was a little past 7:00 a.m. while he was at a stop sign waiting to proceed when a car drove in front of him, blocking his path. He said that a guy got out of the car with a gun and pointed it at him. He testified that there was a young woman in the car with the robber. He also testified that there was a second car with a male and a female in it that pulled up at the same time. Richardson testified that the gunman said to him, "Yeah, get your hands up N____. That's what it is. Get your hands up." Richardson said he raised his hands and then the gunman said, "N____, do you want to die? I just killed a red motherf____ in north Mississippi. Do you want to be next?" On further questioning, Richardson corrected himself to say the gunman said "north Jackson" instead of "north Mississippi". He said he gave the gunman his money. At trial, Richardson was unable to positively identify Lindsey as the person who robbed him, *516 although he said, "I believe that's him sitting at the counsel table."
¶ 47. Richardson testified that shortly after the incident he picked Lindsey out of a lineup and identified him as the gunman who robbed him. Richardson further testified that he did not relate what the gunman said to him in his first report to the police but that he reported the words that the gunman used in a subsequent statement.
¶ 48. Lindsey contends that the effect of Richardson's other crimes, wrongs or acts testimony severely damaged his defense efforts and served only to unfairly suggest to the trial jury that he had committed other bad acts and that he had acted in conformity with such bad acts in the instant case.
According to the record, the trial court's ruling on the matter was as follows:
THE COURT: Here's where I am. I'm prepared to determine that it is not inadmissible based on 404, because I think 404(b) allows for some exception. I'm prepared to determine that it's not inadmissible under 404(b). Which gets me to what I perceive to be at least a second problem we have with it which is what is the worth and value of that statement in and of itself, standing alone as it relates to this particular case. No name was called. No person was specifically referred to. And I'm assuming that's what you were raising, the ambiguity of the statement.
MR. FORTNER: Yes, sir.
THE COURT: Is that what you were raising as what is problematic about the statement itself?
MR. FORTNER: Yes, sir.
THE COURT: And that is a problem for me, Mr. DeLaughter. Do you understand where I am? I think it's an admissible statement but my problem is with the ambiguity of the statement itself and then being able to take that statement and make some determination that that statement is relevant to this particular charge. How do we get past that?
MR. DeLAUGHTER: Yes, sir. Your Honor, first of all, I think that would be a matter for the jury to consider, what weight and credibility to attach to that; not a matter of admissibility. And I've got the case written down in my briefcase, but there was a decision by the State Supreme Court defining Rule 401 dealing with what is to be relevant testimony to the extent that it's admissible in the context of a murder weapon that was introduced. If I remember that case correctly, the cause of death was due to a stabbing. The State offered into evidence, over objection by the defense, a knife that the most the pathologist could testify to could have been the murder weapon. But there was no bloodstain that was compared with the victim. There was nothing forensically that was connected to show that that in fact was the murder weapon. And that was an issue on appeal. The Supreme Court said Rule 401 does not require that type of certainty to get before the jury. The fact that it could have been the murder weapon was enough to get before the jury. And in this case the fact that he could have been referring to Giles Bryant when he made that statement is enough to overcome the hurdle of admissibility. And from that point on, it's a matter of what weight and credibility the jury gives it. Now, they talk about the one eyewitness, Mary Azebeokhai, who is expected to testify that she did see this Defendant and does pick him out in the courtroom and has picked him out previously in a lineup and so forth. But the State is not limited to pick one source of information to establish identity. If the Court finds that this would not be inadmissible because it falls within the identity exception of 404(b), the fact that it goes to establish identity, the fact that it is offered to establish identity is in itself what's relevant about it.

*517 THE COURT: Here's where I am, and we need to take it up briefly Monday morning. I have ruled already that it is not excluded under Rule 404 because the Court is of the opinion that 404(b) provides an exception which would allow that a statement of this kind may be admissible. But both of y'all walked in and were just talking about 404 and I guess I'm concerned about 801 and 403. 403 talks about the exclusion of relevant evidence on the grounds of prejudice, confusion, or waste of time. All I'm saying is when you show up Monday morning, let's make sure that we've explored everything that appropriately should be explored under the rules. And y'all may research it over the next few days and arrive right back at 404. But I'm still looking at 801 and 403. We'll revisit the issue on Monday morning.
¶ 49. When the issue was next raised the trial court ruled as follows:
THE COURT: The earlier ruling stands.
¶ 50. It is clear from the foregoing exchange that the lower court found that Richardson's testimony was admissible under Rule 404(b). It is likewise clear that after having made that determination the court did not conduct an on-the-record 403 balancing analysis. The question before this Court is whether it was error for the trial court to admit this evidence. We find that it was because we do not believe the evidence tended to prove Lindsey's identity. A statement by Lindsey that he had just killed a "red motherf____ in north Mississippi" or north Jackson is not the same thing as saying "I just killed Giles Bryant", nor even the same as saying "I just killed a white motherf____ in north Mississippi or north Jackson" and therefore does not identify Lindsey as the person that shot Giles Bryant. The fact that we are left to speculate as to the racial identity of the person spoken of by the robber is evidence that it was not relevant to the crime for which Lindsey was being tried and should not have been admitted under M.R.E. 404(b). The fact that Richardson thought the robber was talking about having killed a white man is irrelevant, for it is not what Richardson thought but what the robber said that counts, and the robber described the person as red not white.
¶ 51. Having thus determined that this evidence is inadmissible under Rule 404(b), it is of no consequence that the trial court did not conduct a Rule 403 balancing analysis because a balancing analysis is required only when evidence is properly admitted under 404(b). However, this does not end our discussion of the matter, for if irrelevant evidence, which could possibly be considered relevant by the jury and thus influenced by it, was admitted, a reversal would be warranted unless we can say without doubt the evidence was harmless. In arriving at a determination in this regard, we look at other evidence in the record.
¶ 52. When Richardson testified, Jason Lomax had already testified that Lindsey did the shooting. Mary Azebeokhai had already testified that Lindsey was at the scene of the shooting carrying a gun. L.B. Wells had also given testimony from which the jury could infer that it was Lindsey who actually shot Giles Bryant, when he described the shooter as the taller of the two individuals at the scene of the shooting. Latarsha Brown later testified that she, Latasha Stuckey, Lindsey and Lomax drove down Hartfield Street, passed a stopped car and Lindsey and Lomax got out of the car and went back down the street toward the stopped car. She guessed they were going to rob a white man that they had spotted. At that time, Lindsey had a silver-plated .380 pistol in his hand. While she did not see what Lindsey and Lomax did, she did hear a shot and a person begging not to be killed before she heard the shot. After the shot, she drove the car back down the street and picked up Lindsey and Lomax. She scooted over, and Lindsey got under the *518 wheel. She then felt the .380 pistol which felt warm, like it had been shot.
¶ 53. The combined testimonies of these witnesses lead this Court to conclude that although it was error to allow introduction of the Richardson evidence, under these facts, that error was harmless beyond a reasonable doubt because of the overwhelming weight of the evidence against Lindsey. Watts v. State, 717 So.2d 314, 323 (Miss.1998). This assignment of error is denied.

II. The Refusal to Allow the Jury to Inspect the Crime Scene
¶ 54. The case of Tolbert v. State, 511 So.2d 1368, 1378 (Miss.1987) sets forth the standard of review with regard to transporting juries to crime scenes:
Miss.Code Ann. § 13-5-91 (1972) gives the trial court discretionary authority to enter an order providing for the court and jury to view or inspect the place at which the offense has allegedly been committed. The same discretionary authority exists in the civil context as well as the criminal. We will reverse only in the event of a clear abuse of discretion.(citations omitted).
¶ 55. Lindsey contends that Mary Azebeokhai's identification was unreliable, suggestive and unrealistic under the circumstances and that it was critical to his defense to transport the jury to the crime scene to view the conditions under which she made her identification. Lindsey further claims that because the jury was not allowed to view the scene of the identification he was unable to impeach Azebeokhai's capacity and opportunity to observe the offender.
¶ 56. During the pretrial hearing on this motion Lindsey informed the court that he intended to present at least one witness who would give testimony that would contradict Azebeokhai's testimony that she was able to make an identification from the distance and under the lighting conditions that existed at the time of the crime. In denying Lindsey's motion to have the jury transported to the scene of the crime, the trial judge ruled that since Lindsey would have the opportunity to cross-examine Azebeokhai about her ability to make an identification and would present a witness who would contradict her testimony, that was sufficient, in the trial judge's opinion, to challenge Azebeokhai's identification. We agree and find that the trial court did not abuse its discretion in refusing to allow the jury to view the scene of the crime. This assignment of error is denied.

III. The Plea Agreements and the Bribery Statute
¶ 57. Lindsey argues that the district attorney effectively bribed Lindsey's co-indictees into testifying against him in exchange for a "sweet deal," and that with the deal signed and sealed it was no surprise to anyone that the co-indictees "fingered Lindsey as the triggerman." He alleges that the practices of the representatives of the sovereign violated the provisions of Mississippi's bribery statute.
¶ 58. Lindsey did not raise this issue, nor object to the admission of Lomax's or Brown's testimony on this ground at trial; therefore, the trial judge was never given an opportunity to rule upon the issue. Mississippi Rule of Evidence 103(a) provides:
RULE 103. RULINGS ON EVIDENCE
(a) Effect of Erroneous Ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and
(1) Objection. In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context.
¶ 59. The net effect of this rule is that a trial judge cannot be put in error on a matter not presented to him for his *519 decision. Parker v. Mississippi Game and Fish Commission, 555 So.2d 725, 730 (Miss.1989)(citing Cossitt v. Federated Guar. Mut. Ins. Co., 541 So.2d 436, 446 (Miss.1989)). Lindsey's failure to raise this matter with the trial judge would require this Court to treat this complaint as a matter of plain error, which it declines to do. This being the case, we are loath to address this issue further, other than to say that it is without merit.
¶ 60. THE JUDGMENT OF THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT OF HINDS COUNTY OF CONVICTION OF CAPITAL MURDER AND SENTENCE OF A TERM OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HINDS COUNTY.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, DIAZ, LEE, MOORE, PAYNE, AND THOMAS, JJ., CONCUR.