# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2015-KA-00210-COA

AVERALD D. BURNETT, JR. A/K/A JUNIOR          APPELLANT
BURNETT A/K/A JR A/K/A AVERALD
BURNETT, JR. A/K/A AVERALD D. BURNETT
A/K/A AVERAL DAN BURNETT, JR. A/K/A
AVERAL DAN "JUNIOR" BURNETT A/K/A
AVERAL D. BURNETT, JR.

v.

STATE OF MISSISSIPPI          APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 01/23/2015 |
| TRIAL JUDGE: | HON. PRENTISS GREENE HARRELL |
| COURT FROM WHICH APPEALED: | PEARL RIVER COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | MICHAEL W. CROSBY |
| | WILLIAM WARREN SATTERFIELD |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LAURA HOGAN TEDDER |
| DISTRICT ATTORNEY: | HALDON J. KITTRELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF TWO COUNTS OF ATTEMPTED CAPITAL MURDER AND SENTENCED ON EACH COUNT TO THIRTY YEARS, WITH THE SENTENCES TO RUN CONSECUTIVELY IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AND TO PAY A FINE OF $30,000 |
| DISPOSITION: | AFFIRMED: 04/18/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE LEE, C.J., BARNES AND FAIR, JJ.**

**FAIR, J., FOR THE COURT:**

¶1.    Averald "Junior" Burnett was convicted of two counts of attempted capital murder

after he allegedly attempted to hire a jailmate to kill his estranged wife and his stepdaughter. He had been in jail at the time on the accusation that he had forcefully raped the sixteen-year-old stepdaughter. On appeal, Burnett contends he did not receive a fair trial because of certain evidentiary rulings and comments from the trial judge. We find no reversible error and affirm.

## FACTS

¶2. Although the rape of his stepdaughter had allegedly occurred in Lamar County, Burnett was housed in the Pearl River County jail because he was formerly a police officer in Lamar County. In jail, Burnett met Russell Steele, a fellow inmate. Steele testified that he had held himself out to be a killer for hire, and Burnett offered to bail him out and pay him to kill Burnett's estranged wife and stepdaughter. Steele accepted, and Burnett drew him a map to his house, gave him descriptions of his wife and stepdaughter's schedules and sleeping arrangements, as well as other information that would be of use for Steele in finding and killing them. Burnett had his girlfriend bail Steele out and give him some money, which was supposed to be a down payment on the murder. She gave Steele $300 of the $500 promised. Steele used the money to go on a bender, and the next day he called the police and reported what Burnett had tried to do.

¶3. A short time later, Burnett's girlfriend called him at the jail, frightened by Steele's calls demanding more money. The conversation was recorded, and Burnett told his girlfriend to tell Steele to "do what he said he would do or we're going to revoke his bond and he's

2

going to come back and see [Burnett]." From this conversation and other recordings, the investigating officers determined that the girlfriend was not privy to the murder plot, and she testified to that effect at trial. The girlfriend said Burnett told her to bail out Steele because he was in danger from the other inmates and Burnett did not want to be drawn into it.

¶4. Investigating officers questioned Burnett, who claimed he had drawn the map for his divorce attorney and that it must have been taken from his belongings in the cell he shared with approximately twenty other men. He also admitted he may have talked about some details of his home life – his dog, for example – but he could not explain how Steele knew things like the layout of the inside of his home, the schedules of his wife and stepdaughter, and where Burnett's wife parked her car. Burnett claimed he was still devoted to his wife and that he planned to reconcile with her.

¶5. Burnett did not testify at trial, but the theory of his defense was that he had bonded out Steele under pressure from a jailhouse gang as part of a scheme to get "green dot" cards for contraband cell phones. Steele had instead blown the money and then invented the murder-for-hire story as a way to get financial support from the police and to curry favor with prosecutors in his own pending aggravated assault case.

¶6. The jury convicted Burnett of two counts of attempted capital murder, and he appeals.

**DISCUSSION**

### 1. Prosecutor's Arguments / Trial Judge's Comments

¶7. Burnett complains of several comments made by the judge over the course of the trial

3

and of arguments and objections made by the prosecutor that, taken in the aggregate, denied him a fair trial. His arguments on this issue are rather cursory and largely consist of pointing to the arguments or comments and asserting that they were erroneous. We will address them in order roughly from the least to the most prejudicial.

### A. The Prosecutor's Closing Argument Regarding a Second Girlfriend

¶8. Burnett contends that the prosecutor argued facts not in evidence during his closing argument – that Burnett was simultaneously involved with three women, his wife and two girlfriends. Burnett claims there was no evidence in the record of a second girlfriend. This assertion is simply incorrect, as Burnett's wife testified that Burnett had two girlfriends "that she knew of" during the relevant time. She named the second girlfriend in her testimony, and the prosecutor repeated it during the closing argument.

### B. The Prosecutor's Argument Regarding Steele's Reward

¶9. Burnett next complains about the prosecutor's arguments, some of which were made in the presence of the jury, regarding whether Steele had asked for or received a reward for his testimony against Burnett. There is little dispute regarding whether Steele requested or received a reward relating to his pending charges; in fact, during the police interview Steele had rejected a suggestion from one of the interviewing officers that they might try to help him with his pending charges, though Burnett argued that Steele might still expect leniency as a result of his testimony. Burnett focused his arguments on the undisputed fact that the officers put Steele up in a hotel room for a few days and gave him a small amount of money

for food. The officers said they did this because they needed to keep track of Steele during their investigation, but Burnett pointed out that Steele apparently had no money and no place to go, and thus several days of food and shelter was a benefit Steele received as a result of implicating Burnett. From our review of the record, it appears that the prosecution and the defense disagreed about whether this constituted a benefit or reward and were "talking past each other" at times in their arguments. But it is apparent that this disagreement about how to characterize what Steele received was laid bare before the jury and that the prosecutor's characterizations were arguments, based in fact, and created little danger of confusion.

*C. Encouraging Steele to Assert His Right Against Self-Incrimination*

¶10. During Steele's cross-examination, Burnett's attorney asked Steele a series of questions that were ambiguous as to whether they referred to what Steele had claimed while in jail with Burnett, or were regarding things Steele had actually done. At that point, the trial court stopped the cross-examination so Steele could consult with his attorney. Steele later invoked his right against self-incrimination regarding his supposed prior admissions to being a "hit man."

¶11. On appeal, Burnett argues that the prosecutors encouraged Steele to invoke his right against self-incrimination. But he offers no argument on this point beyond bare assertions and the quotation of a lengthy portion of the trial transcript. Reviewing the transcript, we see no instance of either of the prosecutors encouraging Steele to invoke his privilege against self-incrimination.

5

*D. Encouraging Perjury*

¶12.    Burnett also contends that the prosecutors committed misconduct by encouraging Steele to deny his prior testimony regarding his past history as a hit man, by claiming he had understood the questions to be regarding false boasts he had made to Burnett while they were in jail together.   One of the prosecutors did state to the trial judge that it was his understanding of Steele's testimony, but Burnett offered no contemporaneous objection or complaint about the prosecutor's observations.

¶13.    We see no reason to believe that the prosecutor intended to encourage Steele to change his testimony.   Indeed, we share the prosecutor's opinion that this was the most plausible reading of Steele's initial testimony on cross-examination, which was as follows:

> Q.    But suppose that – take me through this.  Suppose [Burnett] is in jail now and he's trying to take advantage of your services as a hit man.  And that's what you held yourself out to be, right? You're a hit man, right?
>
> A.    Yes.
>
> Q.    You kill people and make them disappear, right?
>
> A.    Uh-huh (affirmative).
>
> Q.    Is that right?
>
> A.    Yes.
>
> Q.    And you've done that – how many times would you say you've killed someone and made them disappear?
>
> A.    I don't know what I told him.

6

Q. I know you don't know what you told him. Sometimes when you don't tell the truth, it's hard to remember what you tell, right? You would agree with that?

A. Yeah.

Q. So you don't remember what you told him, right?

A. Well, it's . . . hard to remember[.] Tell me what you were doing July 12th of this year.

No prosecutorial misconduct has been shown on this point.

### E. The Judge's Comments

¶14. During Burnett's cross-examination of his former girlfriend, the trial judge sustained an objection to one of his questions. The judge then added an admonishment, stating in part: "I understand you are on cross, I understand you have wide latitude to lead the witness. But you can't testify." On appeal, Burnett does not seriously argue that the admonishment was unfounded; he contends it influenced the jury through the suggestion of bias on the part of the trial judge, when taken together with two other comments from the judge.

¶15. During voir dire, the trial judge apparently omitted the word "defendant" while instructing the venire not to presume guilt from the fact that the defendant was indicted:

Another thing I want to tell you, that every criminal defendant that comes to court has been indicted by a grand jury. Now, a grand jury only hears one side, and what they hear is not necessarily absolute proof. It is not proof that the defendant is guilty. And if you believe that the defendant is guilty simply because a grand jury indicted them, you would be wrong. However, you may believe that. If you do believe that, I need to know that also. Does anybody believe that just because a grand jury has indicted a criminal, that they must be guilty? If there are, hold your hand up. No cards.

7

When this was called to the judge's attention, he immediately informed the venire he had misspoken when he initially gave the instruction, and he repeated its admonition as to the "defendant." The judge also instructed the jury:

> The Court instructs the jury that the fact that the defendant has been indicted by a grand jury is not evidence of guilt but rather a procedural process of bringing this case to the circuit court for trial[,] and you are instructed not to consider the indictment as evidence but to determine the guilt or innocence of the defendant based solely on the facts, evidence and law presented in this case.

¶16. Finally, during the redirect examination of a police investigator by the prosecution, the following exchange occurred:

> Q.    Did Mr. Steele ask for any leniency or anything on his charges?
>
> A.    He never one time, from the first time that I dealt with him during the ride to my office, throughout all of this investigation, never once asked for help for anything. Not once.

Burnett objected to this answer on the basis that:

> The officer is under a duty to testify truthfully. And that's an ethical duty. And I would object to that, because under the rules of ethics you must not do that. And I would object to information – false information.

The trial judge overruled the objection, and stated:

> [T]he officer understands the responsibility of being truthful under his oath. I believe he does. And if he makes a response, unless there is proof that he is directly being untruthful, then I'm going to let him respond. If you can give the Court evidence that he is not being truthful, you are welcome to submit it. But if he makes a statement under oath, I'm going to believe him.

¶17. Both the objection and the judge's response apparently occurred within the hearing of the jury. Burnett's attorney asked the trial court to allow him to make a motion regarding

8

the statement at a later time. When that motion was presented, the trial judge reviewed the transcript of his ruling and agreed that it was inarticulate and could be misinterpreted as a comment on the witness's veracity rather than on the competence of his testimony. Burnett then accepted the trial judge's offer of a corrective instruction. The jury was instructed as follows:

> It is the duty of the judge to be completely fair to both sides in this trial, and if any instruction, ruling, or statement by the Court seems to indicate to you that the Court has any opinion about the case or any particular fact, such indication would be completely false, and you must disregard it.

> It is your exclusive province to determine the facts in this case and to consider and weigh the evidence for that purpose.

> . . . .

> As sole judges of the facts in this case, you determine what weight and what credibility will be assigned the testimony and supporting evidence of each witness in this case.

> . . . .

> The production of evidence is governed by rules of law, and from time to time during the trial the Court may have ruled on the admissibility of evidence[.] You . . . must not concern yourself with the reasons [for] the Court's rulings since they are controlled by rules of law.

The court also gave two other instructions on the issue of witness credibility, with one stating:

> You the jurors are the sole judges of the facts in this case. You decide whether you believe each witness and how important each witness's testimony is to the case. You may believe all, a part, or none of a witness's testimony.

¶18. "Trial judges may explain their rulings on evidentiary objections so long as they do

9

not comment upon the evidence in a prejudicial manner." *Wells v. State*, 698 So. 2d 497, 510 (Miss. 1997). We agree with Burnett that the trial judge's initial explanation of his ruling could be construed as a comment on the evidence and that the statement was potentially prejudicial. However, we note that the objection and the comment were not addressed to a true factual dispute – the facts as to what Steele had asked for and received were unquestioned – but one of semantics and the interpretation of undisputed evidence – whether the officers providing Steele with food and shelter for a few days amounted to "help or anything." That dispute was presented to the jury, clearly and at length, and the trial judge's comment did not speak to it. Moreover, the trial judge took corrective action, and the jury is presumed to have followed the trial court's instructions. *Galloway v. State*, 122 So. 3d 614, 634 (¶36) (Miss. 2013). Burnett has not overcome that presumption, either on this individual remark or on the remarks of the trial judge and actions of the prosecutor that we have discussed previously. Reviewing the record of the trial as a whole, we find no reversible error has been shown under this issue.

### 2. Character Evidence

¶19. Burnett next complains that the trial court erred in overruling his objection to his former girlfriend's testimony during her direct examination by the prosecution. The girlfriend detailed the things she had done for Burnett after he was accused of rape, including running his errands, bailing out Steele, attempting to get Burnett "green dot" cards and apparently plotting to help him obtain an unauthorized cell phone for use in jail, and

supplying $25,000 of her own money for his legal defense. She also described how she and Burnett referred to each other as husband and wife despite Burnett being married to someone else. The girlfriend was then asked – in the context of "as a result of all this" and after speaking to a police investigator who was investigating the instant charges – whether she had "cared for" Burnett in the sense of feeling affection or love toward him. She responded that she had. This was followed with, "What is the impression that you have about [Burnett] now?" Her response was that Burnett "is a liar, and he is a master manipulator." Burnett objected to this as impermissible character evidence, but the objection was overruled.

¶20. Burnett's argument on appeal likewise is that this was improper character evidence. While we agree that the particular phrasing of the response could be read as speaking to Burnett's character, in context it is difficult to interpret the challenged testimony as anything but a statement of what the witness felt Burnett had done to her during the events at issue. More troubling is the ambiguity of the question and the possible lack of a foundation in personal knowledge; it is unclear whether the witness was testifying that she was upset at Burnett's statements to police investigators that he intended to reconcile with his wife, that he had another girlfriend, that she believed he was guilty in the murder-for-hire plot, or some combination of the three. However, error cannot be founded on that theory, as it was not the basis of Burnett's objection at trial. An "[o]bjection on one ground at trial waives all other grounds for objection on appeal." *Carter v. State*, 722 So. 2d 1258, 1261 (¶13) (Miss. 1998).

¶21. "The standard of review regarding admission or exclusion of evidence is abuse of

11

discretion. Where error involves the admission or exclusion of evidence, [a reviewing court] will not reverse unless the error adversely affects a substantial right of a party." *Ladnier v. State*, 878 So. 2d 926, 932-33 (¶27) (Miss. 2004). Thus, while we agree with Burnett that the objection should have been sustained based on the particular phrasing of the testimony, that Burnett's ex-girlfriend held a low opinion of him following the events at issue would have come as no surprise to the jury. The statement might even be regarded as favorable to the defense, as an admission of bias from a prosecution witness. We are satisfied that overruling the objection did not affect the result of the trial, and we do not find the error to be reversible.

### 3. Spoliation

¶22. Next, Burnett contends that the trial court erred in refusing to grant a jury instruction on his claim of spoliation. One of the police investigators testified that Burnett had claimed during an interview that jail surveillance tapes would show he was accompanied by other individuals in his cell while he was speaking on the telephone. Burnett apparently claimed these individuals were directing him to do things relating to the "green dot" cards and cell phones. Burnett also claimed the video recordings would show him writing a letter he claimed was somehow relevant to the investigation. The video recordings were never viewed by the investigator, and they were apparently allowed to be automatically overwritten.

¶23. The investigator testified that he did not check the recordings because he had limited resources and the recordings would have had little relevance to the investigation. It was

uncontested that Burnett's cell mates were often near him when he was using the phone, and they could be heard speaking to Burnett on the audio recordings of Burnett's calls, which were preserved. The investigator added that he had been monitoring Burnett in the jail to protect him from the other inmates, as Burnett was a former police officer, but the other inmates never sounded hostile to Burnett in the audio recordings; instead, they were offering Burnett advice or engaging in friendly banter. The investigator had repeatedly spoken to Burnett during the time he was incarcerated and Burnett had always denied that he had any problems with the other inmates.

¶24. The investigator also testified that he did not believe the video recordings would have been of any use in investigating Burnett's claims about the letter, as Burnett had never told him what the letter's significance was. Also, it was undisputed that Burnett had written many letters while in jail, and the video recordings would not have been able to prove he had written any particular one.

¶25. The spoliation instruction should be given only when a factual basis exists to conclude that "the spoliation or destruction was intentional and indicates fraud and a desire to suppress the truth." *Tolbert v. State*, 511 So. 2d 1368, 1372-73 (Miss. 1987). Spoliation cannot be found "where the destruction was a matter of routine with no fraudulent intent." *Id.* Burnett failed to show that the recordings were destroyed in bad faith, and consequently we find no error in the trial court's refusal of the spoliation instruction.

    **4.**     **Sentencing Hearing**

13

¶26. Pursuant to statute, the trial court held a bifurcated sentencing hearing. *See* Miss. Code Ann. § 97-1-7(2) (Rev. 2014). The jury could not unanimously sentence Burnett to life imprisonment. After the first hearing, the trial court stated it would only receive additional evidence in written form, though it did allow Burnett to give a statement prior to sentencing by the court, if he desired (he declined). Burnett's attorney protested the decision not to hear any further live testimony, but he did not proffer any additional evidence. The court also spoke to the victims prior to sentencing, in chambers with counsel present, but off the record, and the trial judge apparently offered the victims consolation and advice.

¶27. On appeal, Burnett presents numerous complaints about the sentencing process. But he offers nothing in support other than conclusory claims of error. The failure to present an argument and cite authority renders this issue procedurally barred. *Rolison v. Fryar*, 204 So. 3d 725, 738 (¶33) (Miss. 2016).

### 5. Cumulative Error

¶28. Finally, we address Burnett's claims of cumulative error. "The cumulative error doctrine stems from the doctrine of harmless error which holds that individual errors, which are not reversible in themselves, may combine with other errors to make up reversible error, where the cumulative effect of all errors deprives the defendant of a fundamentally fair trial." *Harris v. State*, 970 So. 2d 151, 157 (¶24) (Miss. 2007).

¶29. Although we have acknowledged several errors, they were either minor or were sufficiently corrected by the trial court. We see no cumulative effect and are satisfied that

Burnett received a fair trial. It is axiomatic that an accused is entitled to a fair trial, not a perfect one. *See, e.g., Ronk v. State*, 172 So. 3d 1112, 1148 (¶109) (Miss. 2015).

¶30. **THE JUDGMENT OF THE CIRCUIT COURT OF PEARL RIVER COUNTY OF CONVICTION OF TWO COUNTS OF ATTEMPTED CAPITAL MURDER AND SENTENCE ON EACH COUNT OF THIRTY YEARS, WITH THE SENTENCES TO RUN CONSECUTIVELY IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AND TO PAY A FINE OF $30,000, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO PEARL RIVER COUNTY.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, CARLTON, WILSON, GREENLEE AND WESTBROOKS, JJ., CONCUR.**